## Rice, et al. v. Thomas, et al.

(Decided March 28, 1919.)

## Appeal from Shelby Circuit Court.

1. Corporations—Issual of Stock Without Payment—Cancellation.—
Secs. 193 of the Constitution. and 568 of the Statutes forbid cor-
porations to issue stock without a payment in money or property
or services of the actual value of the stock, and likewise forbid
the issual of fictitious or bonus stock, and if stock should be
issued contrary to those provisions, it is subject to cancellation
at the instance of stockholders who do not consent thereto, and
when the corporation attempts of its own accord to cancel such
stock, its action will not be enjoined at the instance of minority
stockholders.

2. Corporations—Creditors—Appropriation of Trust Fund.—Creditors
of a corporation have the right to look to and appropriate its
assets, including unpaid stock subscriptions, as a trust fund which
the corporation holds for their benefit. But this right is not ab-
solute from the time of the creation of the debt so as to place
such assets in lien for that purpose, but they become so character-
ized when the corporation becomes insolvent and it is necessary
for the creditors to go into court in order to collect their debt.
So that althought an attempted cancellation of stock wrongfully
issued might operate to the detriment of prior creditors, their
right to complain does not accrue until their debts mature and
the corporation becomes insolvent, and a suit brought by them
to enjoin such cancellation before that time will be dismissed
as prematurely brought, but such dismissal will not be a bar to
their right to look to the cancelled stock for the collection of
their debts when they mature and it is necessary therefor.

3. Corporations—Creditors.—Creditors within the above rule and
having the rights above enumerated are only those who become
such while the liability existed which was, or which is attempted
to be, released or canceled, and does not include creditors whose
debts were contracted before the liability, released or cancelled
was assumed; nor those whose debts were incurred after such
release or cancellation, but the knowledge of a creditor at the
time his debt is created of an unexecuted agreement to release or
cancel the liability made by the corporation will not alone be
sufficient to defeat his right to appropriate the fund to the pay-
ment of his debt.

4. Corporations—Control and Management—Actions.—A court will
not substitute its judgment at the instance of minority stock-
holders for that of the governing body of the corporation in the
internal management of its affairs, unless the actions complained
of are so clearly against the interest of the minority as to in-

dicate bad faith and amount to a wanton and fraudulent destruction of their rights and constitute a flagrant violation thereof.

R. N. MILLER, THUM & ROY for appellants, Cale Young Rice, Alice H. Rice and Fannie C. McCauley.

H. K. BOURNE for appellants, A. J. Elliston, P. M. Elliston and Badie McIntyre Guthrie.

W. T. BECKHAM, TURNER & TURNER, WILLIS, TODD & BOND for appellees.

OPINION OF THE COURT BY JUDGE THOMAS —Affirming.

The appellee, Shelby County Telephone Company, is a Kentucky corporation, organized on November 16, 1906, with an authorized capital stock of $120,000.00. It owns and operates a local telephone system with its central office in Shelbyville and its lines extend out from that town, mostly in Shelby county, with other exchanges at different places to meet the necessities and convenience of its patrons. Prior to October 16, 1906, a telephone company by the same name, but incorporated under the laws of West Virginia, owned and operated the plant.

That company had succeeded another West Virginia corporation, the name of which was Shelbyville Home Telephone Company, which had constructed the plant. On the last date mentioned a number of gentlemen contracted to purchase all of the stock and assets of whatever nature of the West Virginia Shelby County Telephone Company, which at that time was capitalized at $180,000.00, $80,000.00 of which was preferred stock and $100,000.00 common stock. The purchasers were divided into ten units, and each unit, some of which were composed of more than one individual, agreed to take and pay for one-tenth of the purchase price, which was $60,000.00. This amount was not paid at the time, but was evidenced by notes signed by all the individuals composing the ten units and the notes were to become due and payable some time in the following February. When they became due they were paid and the payors received, according to agreement among themselves (they being the only ones interested) bonds of the newly formed corporation to the amount of $60,000.00, that being the agreed purchase price of the West Virginia corporation. Prior to that time and when the Kentucky corporation was

formed, the members composing the ten units who purchased the West Virginia corporation subscribed the articles of incorporation for stock to the amount of $57,000.00, but no stock was issued upon the formation of the Kentucky corporation; the subscribers who turned over to that corporation all of the assets of the purchased West Virginia corporation took only the bonds of the newly formed corporation. The stock of the former corporation was by mutual agreement placed in the hands of a trustee and stock certificates were issued to the ten units who purchased that corporation, and these certificates and the bonds were the only securities which they held until something near a year after the Kentucky corporation was formed, when by unanimous consent the charter of that corporation was amended so as to permit it to issue $60,000.00 of its stock as preferred and $60,000.00 as common, the preferred stock being so only as to dividends. It was further provided in the amendment that the corporation was authorized to take up its bonds with preferred stock at the option of the holders, and this, according to the testimony, was agreed to by all parties interested. Following that amendment the members of the ten units to whom bonds had been issued presented them, and in lieu thereof received preferred stock.

In October, 1907, shortly after the issuing of the preferred stock in lieu of the bonds, by a vote of the directors, and we think, according to the testimony, with the consent of all of the stockholders, it was agreed and so resolved at a meeting of the directors that the voting trust which had been formed by a deposit of the stock of the purchased West Virginia corporation should be dissolved, and that the secretary of the corporation should, on the presentation of the trust certificates, which had been issued to the members of the purchasing units, issue to the holders of such certificates, as a bonus, common stock in proportion to the amount of preferred stock which the holders of such certificates held. Most of the holders of preferred stock availed themselves of that offer and obtained their proportion of common stock, while as to others the common stock seems to have been issued but not delivered, and perhaps in other cases the common stock was never called for, since the trust certificates were not presented, but no one denies that the proposition was open to all alike, and each one holding

trust certificates and preferred stock could have obtained their bonus common stock by presenting their trust certificates and demanding the stock. The charter of the Kentucky corporation as amended empowered it to issue bonds up to the amount of its authorized capital stock, but for some time no bonds were issued except the original $60,000.00 representing the purchase price of the West Virginia corporation, and which was authorized by the original articles. Afterward, as the plant was enlarged, other bonds were issued, the exact amount of which is not shown, but at the time of the filing of this suit there were outstanding bonds to the amount of $28,500.00, none of which were due. When the suit was filed the company was also indebted for reconstructing its plant which had burned, and other necessary expenses, in the sum of about $5,000.00, making its total indebtedness in the neighborhood of $33,000.00.

Shortly before the suit was filed the company, with the consent of more than two-thirds of its stockholders, and pursuant to the provisions of the Kentucky Statutes, amended the articles of incorporation so as to reduce the capital stock from $120,000.00 to $60,000.00, and proposed to cancel all of the bonus common stock which had been issued and authorized to be issued in 1907. When that reduction was about to be made and the common stock cancelled, this suit was filed by appellants, Cale Young Rice, Alice H. Rice and Fannie C. Macauley, holders of preferred stock, against the corporation, the surviving members of the ten units who purchased the West Virginia corporation, and the personal representatives of such as had since died, seeking to restrain the corporation and the individual defendants who were stockholders, and some of whom directors and officers of the corporation, from cancelling any of the common stock pursuant to the last amendment to the charter, and to recover of each of them except the corporation their part of the subscription price of the original $57,000.00 of stock which it is claimed they subscribed for in the original articles of incorporation, and whch it was alleged they had never paid. Other injunctive relief against what plaintiffs claim to be mismanagement of the affairs of the corporation was also sought. Afterward appellants, A. G. Elliston, P. M. Elliston and Mrs. Badie McIntyre Guthrie, who are creditors of the corporation, owning some of its un-

matured bonds, came into the case and sought practically the same relief as did plaintiffs.

The allegations of the pleadings of all these parties were denied by the defendants, and in their pleadings they sought to justify the last amendment to the articles of incorporation by having complied with the law and obtained the consent of the necessary number of stockholders and pleaded estoppel against plaintiffs upon the ground that they or their transferors had consented to all that had been done in regard to the matters complained of. Appropriate pleadings made up the issues, and after the taking of a great deal of testimony, the court discharged the restraining order which had been issued by the clerk upon the filing of the suit, after which an order was made by the directors cancelling all of the common stock. Following that, plaintiffs filed an amended petition asking a mandatory injunction requiring the directors to rescind that order of cancellation. This was followed by the taking of an additional amount of testimony, and upon final submission the relief which plaintiffs and their intervenors sought was denied and their pleadings dismissed, and complaining of these judgments of the court, this appeal is prosecuted.

It will at once be seen that there are two branches of this case; one involving the rights of stockholders and the other the rights of creditors. We have been referred to a vast number of cases, some from this court, but many of them from courts of other jurisdictions, upon various phases of the right of stockholders and creditors to correct what they claim to be the abuses of majority stockholders, officers and directors of the corporation which operated to the detriment of the minority stockholders, as well as against the rights of creditors. But an examination of those authorities will, we think, reveal that they arose out of and apply to an entirely different state of facts from those we have here. To undertake to notice those authorities and to differentiate between the facts, circumstances and conditions under which the doctrines they announce were applied, and the facts disclosed by this record would make this opinion too long, and would be an unnecessary burden upon our time. Suffice it to say that all principles of law grow out of the facts of each case, and this statement applies as well to the law relating to corporations and those sustaining different relations to them as it does to other branches of the

law. So that in dealing with any case the first essential is. to ascertain the facts and the precise relation which the parties litigant sustain the one to the other. Following that course here, we find that the defendants against whom judgment is sought for the amount of their subscribed stock did take $3,000.00 more of the stock than they subscribed for. This includes the $10,000.00 which is held by the plaintiff, Mrs. Alice H. Rice. The proof, however, shows that her uncle, Mr. J. C. Burnett, was her general financial agent at the time, and that he subscribed for $10,000.00 of the original issue of $60,000.00 of the bonds, $5,000.00 of which he procured to be issued or transferred to Mrs. Rice and as her agent purchased an additional $5,000.00 worth of the bonds; when the bonds were exchanged for preferred stock he as her agent effected the exchange and procured her preferred stock, at which time there was issued to her a corresponding amount of common stock, which does not appear to have been delivered to her personally, but to her agent. We have no trouble in concluding that the issual by the corporation and the acceptance of the $60,000.00 of preferred stock by the original subscribers was a discharge of their original subscription obligation. So that their liability in this case, if any, grows out of their subsequent acceptance of the unsubscribed for common stock which was issued to them purely as bonus stock. However, there is no doubt about the proposition that an acceptance of certificates of stock makes the acceptor liable thereon, if liable at all, as though he had originally subscribed for it. Kentucky Mutual Investment Co.'s Assignee, &c. v. Schaeffer, &c., 120 Ky. 227; Williams' Exr. v. Chamberlain, 123 Ky. 150; Webster v. Upton, 91 U. S. 66; Chubb v. Upton, 95 U. S. 665.

Section 193 of our Constitution and section 568 of the Statutes provide in substance that no corporation shall issue its stock except for an equivalent in money paid or labor done or property actually received and applied to the purpose for which the corporation was created, and neither labor nor property shall be received in payment of stock at a greater value than its market price at the time, and that all fictitious increases of stock shall be void. While section 547 provides that the stockholders of each corporation shall be liable to the creditors who became such while the liability. was outstanding

for the full amount of unpaid stock subscribed for by them. Section 553 provides for and points out the method by which the capital stock of any corporation may be increased or reduced.

As we have said, the method therein pointed out was pursued in this case when the capital stock of this defendant corporation was reduced from $120,000.00 to $60,000.00. And furthermore, as we have seen, the proposed cancellation of the common stock was not that of any particular subscriber. The contemplated action provided for the cancellation of the whole of it which was either owned by the holders of the preferred stock and that to which those who had not obtained it were entitled. At this point it might be well enough to state that the cases of Gaithright v. Oil City Land & Improvement Company's Receiver, 21 Ky. Law Rep. 1657; John R. Proctor's Land Co. v. Cooke, 19 Ky. Law Rep. 1734; Paducah Land, Coal & Iron Co. v. Mulholland, 15 Ky. Law Rep. 22; Same v. Hayes, *idem.*, 517 and other Kentucky cases, have no bearing upon the questions involved here, since they deal with the rights of the corporation and its stockholders, as between themselves, growing out of facts essentially different from those here presented, or where the corporation was insolvent and the rights of creditors were involved, or where a fraudulent purpose was attempted to be accomplished by the corporation favoring one stockholder over another in such a way as to prejudice the rights of the latter, none of which questions do we find the facts of this case to present.

What then are the rights of the complaining stockholders under the facts disclosed by the record? The latest work on corporations to which we have access is Fletcher's Cyclopedia of Corporations, published in 1918, and in the chapter dealing with the rights of the corporation and its stockholders with reference to wrongfully or illegally issued stock, in vol. 5, sec. 3485, the text says:

"If certificates of stock are issued illegally, or by an officer fraudulently or without authority, and the circumstances are such that they are either void or voidable, the corporation may cancel the same or they may be cancelled by a court of equity in a suit brought for that purpose by the corporation or in a proper case, by a stockholder of a corporation. So stock may be cancelled where it is issued without consideration, or for property

or services which do not constitute a legal consideration for the issuance of stock; or where there is a total failure of the consideration upon which it is issued; or where it is issued through a mistake of fact; or pursuant to a void contract; or in fraud of the rights of the other stockholders; or where the corporation was induced to issue it through fraud.''

Cases from some twenty or more states and from the Supreme Court of the United States are cited in support of the text, among which are those of Crow v. Florence Ice & Coal Co., 143 Ala. 541, and Stebbins v. Perry Co., 167 Ill. 567.

In the Alabama case the court upon this subject said: ''Equity jurisdiction to declare the issuance of fictitious stock in a corporation void, and to have the certificates representing such stock cancelled can not be questioned.'' And in the Illinois case it was held that: ''Equity has jurisdiction to cancel over issued stock, or stock the issuance of which was forbidden by law.''

Other parts of the chapter in the work referred to conclusively show that stock issued contrary to the provisions of a constitution or statute such as we have is issued contrary to law and in a way forbidden by law, and to the extent that it was not paid for it is fictitious stock which equity, as we have seen, upon a proper application will cancel. Some courts even go to the extent, as stated in sec. 3486 of that publication, of holding that ''stock issued without authority and in violation of law is void, and confers no rights on the person to whom it is issued and subjects him to no liability.'' But we are not called upon to and do not now adopt that as a correct principle of law under all circumstances. In sec. 3494 of the work referred to the right of the corporation or the stockholder to cancel fictitious or illegally issued stock is again asserted when it is said that ''if the officers of a corporation fraudulently or wrongfully issue fictitious or illegal certificates of stock, the corporation, or, if it refuses to sue, a stockholder on behalf of himself and the other stockholders may maintain a suit in equity to cancel the certificates and to enjoin their transfer.'' In dealing with the right of the corporation and its stockholders with reference to stock issued purely as a bonus, in section 3520, it is said that the stockholder ''may sue to enjoin the issue of the stock, or to cancel it if it has been issued and has not reached the hands

of a *bona fide* purchaser." Still further, in section 3585 of the same work the rights of a dissenting stockholder, to the wrongful issuance and delivery of fictitious or bonus stock, are stated thus:

"If a corporation is about to issue stock without receiving payment in full, in violation of the common law rights of stockholders, or in violation of a charter, statutory or constitutional provision, a dissenting stockholder may maintain a suit in equity on behalf of himself and other stockholders to enjoin it from doing so. Or, if the stock has already been issued, he may maintain a suit to annul and cancel the same, provided he is not barred by laches or acquiescence or the rights of *bona fide* purchasers for value."

However, this court in the case of Paducah Land, &c., Co. v. Hayes, *supra*, had under consideration the wrongful issue of $4,500.00 worth of the capital stock, which the persons to whom it was delivered had fraudulently procured without paying for it, in that they had put into the corporation a tract of land at much more than they had agreed to take for it, the fraudulent stock being issued for the increased price. When the owners of some of that stock were sought to be held liable thereon, this court said: "However firm the belief of these directors was that the lands were in fact worth the $100,000.00 paid for them, and it is by reason of that belief that their conduct is rendered less reprehensible, yet we think that good faith required them to give the benefit of the transaction to the stockholders for whom they must be held to be acting. *This would result in a return of these 4,500 shares and their cancellation.*"

That case dealt with the rights of the parties as fixed by transactions occurring before the adoption of our present Constitution and before the enactment of section 568 of the Statutes.

In the very recent case of Taylor v. Citizens' Oil Co., 182 Ky. 350, the direct question now under consideration was presented, and it was held that stock issued wholly or partially without consideration in violation of the Constitution and the statute was subject to be cancelled at the instance of other stockholders, especially while it remained in the hands of the persons to whom it was originally issued. In that case options had been exchanged for the stock at greatly inflated values, and stockholders who had paid for their stock and who were

without knowledge of the consideration of the stock sought to be cancelled brought suit to have the wrongfully issued stock cancelled to the extent that it was without consideration. The trial court granted the relief, and while on appeal the judgment was reversed, it was not because the stock was cancelled, but upon another point. In approving that part of the judgment cancelling the stock, this court said: "It may now be regarded as the settled law of this state that one who procures a corporation to issue its stock to him without giving. to the corporation labor or property equivalent in value to the face of the stock may in the suit of the corporation or a stockholder for its use and benefit, under section 568 Kentucky Statutes, be compelled to surrender for cancellation all stock in excess of the market value so given or paid, or such stockholders may, in the suit of creditors, under section 547, Kentucky Statutes, be compelled to account for and pay the difference between the amount actually paid for the stock and the par value thereof, this amount to be gathered into the treasury of the corporation for the payment of debts."

In support of that part of the excerpt as to the right of creditors (becoming such after the stock was taken or subscribed for) to collect for the payment of their debts the subscription price of the stock or the unpaid portions of it, the court refers to the cases of Haldeman v. Ainsle, 82 Ky. 395; Baking Co. v. Eiseman, 94 Ky. 83; Ky. Mutual Investment Co., &c. v. Schaeffer, *supra,* and Jones v. Bowman, 181 Ky. 722. We think these authorities settle the question here presented by the appealing stockholders against their contention. For surely a court of equity will not enjoin, at the instance of a litigant, an act which it would at the instance of that same litigant, and under the same facts, enforce. In this case the board of directors had taken steps to and had actually cancelled all the bonus stock of which complaint is made, which action as we have seen could have been enforced at the instance of the stockholding appellants, and under the circumstances they can not complain of that act by having it rescind and then collect the stock as though it was not tainted with any infirmity.

Turning now to the branch of the case affecting the rights of the appellants who are creditors, it may be stated that courts have entertained different theories as forming the basis of the right of a creditor (who became

such after the liability was assumed by the stockholder
and before cancellation) to appropriate to the payment
of his debt uncollected subscriptions to stock or to reach
such assets when they are fraudulently or otherwise at-
tempted to be withdrawn. Some of the courts hold that
the right of the creditor to maintain such suits is upon
the theory that such unpaid subscriptions, or wrongfully
withdrawn assets, constitute a trust fund for the benefit
of creditors, while others bottom the right of the cred-
itor upon the theory that to allow a stockholder to retain
the stock and not pay for it would be a fraud upon the
creditor's rights. This court, in the case of Williams'
Exr. v. Chamberlain, *supra,* and in other cases referred
to therein, and in cases since then, has adopted the trust
fund theory, but it is quite generally, if not universally,
held by the courts adopting that theory that such assets
do not constitute in the fullest sense of the term a "trust
fund," for if so such fund would at all times be in lien
for the payment of outstanding debts, and a creditor, of
the class as above defined, when the time arrived for
him to proceed, or when his debt became due, when he
could proceed, could follow any such fund into the hands
of whomsoever the corporation may have paid it in the
regular discharge of its business transactions, and this,
too, regardless of whether it was solvent or insolvent at
the time the payment was made. So that the precise
meaning and scope of the trust fund doctrine is that
such assets become clothed with all the characteristics of
a trust for the benefit of creditors when and only when
it becomes necessary for the creditor to resort to them
in order to satisfy his debt. That time is when the cor-
poration becomes insolvent, for until then there would be
no occasion for the creditor resorting to such fund,
since he could make his debt out of the solvent corpora-
tion. Without elaboration we will content ourselves with
referring only to some of the authorities holding to this
doctrine. Fletcher's Cyclopedia of Corporations, vol.
5, sec. 3590, 7 R. C. L., pages 199-200; Buck v. Ross, 57
A. S. R. 60, and notes thereto; Conover v. Hull, 45
A. S. R. 810, and notes thereto, and Hollins v. Brierfield
Coal Co., 150 U. S. 371. Other cases will be found in the
notes to the cases referred to.

In the case of Fogg v. Blair, 133 U. S. 534, the
Supreme Court of the United States, in defining the pre-
cise meaning of the trust fund doctrine for the benefit of

creditors of a corporation said that the property of an insolvent corporation "is doubtless a trust fund for the payment of its debts, in the sense that when the corporation is lawfully dissolved and all of its business wound up, or when it is insolvent, all its creditors are entitled in equity to have their debts paid out of the corporation property before any distribution thereof among the stockholders."

In the Hollis case it is said that: "It (trust fund doctrine) does not mean that the property is so affected by the indebtedness of the company that it can not be sold, transferred or mortgaged to *bona fide* purchasers for a valuable consideration except subject to the liability of being appropriated to pay the indebtedness. Such a doctrine has no existence."

In the Cyclopedia of Corporations, *supra,* vol. 5, sec. 3598, the time when the creditor may proceed to subject the unpaid subscriptions as "a trust fund" is thus stated: "The creditors' remedy accrues and limitations run from insolvency." If the fund since the creation of the debt has been wrongfully appropriated, cancelled or withdrawn, and is not in the hands of innocent parties for value, the creditor may then ignore the wrongful act and proceed to subject it. See also 10 Cyc. 1249.

The other authorities referred to hold substantially the same views, and indeed we have been unable to find any to the contrary. The case of Williams' Exr. v. Chamberlain, *supra,* and others from this court adopteing the "trust fund" doctrine deal with a situation where the corporation was insolvent, and it was under such circumstances that it was said in them that the assets and property of a corporation constituted a trust fund for the benefit of creditors, meaning thereby that the trust in all of its force arose when it became necessary for the creditor to resort to that fund for the payment of his debt, which of course would be when the corporation was insolvent. There might in the meantime be an existing inchoate right, not immediately enforceable for the benefit of creditors, which would prevent the wrongful disposition or cancellation of stock subscriptions by the corporation while solvent so as to defeat a prior creditor's right when the occasion arose for him to assert it. But such right would not give to the creditor a present cause of action before his debt became due and before the corporation became insolvent, for in the meantime his debt

might be paid and there would then arise no occasion for him to object. The authorities referred to further hold that the doctrine applies only for the benefit of creditors whose debts were incurred after the cancelled, released or unpaid liability was assumed, and not for the benefit of a creditor who became such subsequent to the complained of act, whose rights will not be affected, since they were acquired after the alleged action was taken attempting to retire, release or cancel the stock. Cyclopedia of Corporations, *supra,* vol. 5, sec. 3472, and 7 R. C. L. 550.

Applying this principle to the facts of this case, manifestly no creditor who became such after the cancellation of the common stock could complain of that act, and since the debts of the appellants who are prior creditors, as above defined, are not yet due, and the corporation is not insolvent, they can have no standing in court, either to collect the stock or to object at this time to its cancellation.

At this point, however, it is insisted that the corporation defendant here is insolvent, but without going into a detailed statement of the evidence upon that question, we are convinced that appellants are in error. It is true that the testimony shows that some parts of the telephone system are out of repair, but the company now has nearly twice as many telephones as it had at the beginning. Its lines have been greatly increased, and it has new, modern equipment where it did have that which was old and antiquated. It has a paying and healthy patronage, and while it may not be as prosperous as better management might have made it, we do not think the testimony sufficient to show that it is insolvent. Since, however, prior creditors (to which class appellants belong) may have occasion to resort to the cancelled common stock when their debts become due, followed by insolvency, we think the judgment dismissing their pleading absolutely instead of without prejudice is to that extent erroneous, for if the judgment stands without the correct reason given for the dismissal, it would perhaps create a bar against their right to subsequently proceed to collect the cancelled stock if occasion should arise necessitating it. But we do not think this error sufficient to reverse the judgment, since we now hold that the dismissal of the pleading of the

creditors was authorized only because their suit was prematurely brought, and for that reason the judgment will not be a bar to their right or that of other prior creditors to hereafter proceed to collect enough of the cancelled stock to pay their debts should it be necessary when the time for their collection accrues.

Other matters are complained of in the appellants' pleading which pertain to the internal management of the affairs of the corporation, such as a failure to hold regular directors' meetings, a failure to keep the property insured to the extent of its value, the employment of an unnecessary number of servants to look after the property and affairs of the company, and other alleged mismanagement of like nature; but the rule is well settled that a court of equity will not in such matters substitute its judgment at the instance of minority stockholders for that of the governing body of the corporation, unless the actions complained of are so clearly against the interest of the minority as to amount to a wanton and fraudulent destruction of their rights and constitute a clear, substantial and flagrant violation of corporate duty. Notes to Buck v. Ross, *supra,* and Hart v. Ogdensburg, &c., R. R. Co., 89 Hun 316, and Lowe v. Pioneer Threshing Co., 76 Fed. 656. Indeed this immunity from interference by the courts is admitted by counsel for appellants when they say in their brief that "thus while it is a rule that courts will not generally interfere with the internal management of corporations, still where by corporate action, partiality and inequality amounting to usurpation or fraud or unfair discrimination is effected, the courts will interfere."

We see nothing in the complaints made in this regard to take this case out of the general rule, since there are no such derelictions shown as to operate as a fraud upon the rights of the minority stockholders or to in any manner imperil their holdings. The evidence is conflicting as to whether an excessive number of employes were engaged by the company, and while monthly meetings of the directors may not have been held, yet in most instances efforts were made to hold them but it was prevented for lack of a quorum. However this may have been, it is not shown that the failure to meet resulted in any loss. Nor can it be said that there was any dereliction in regard to procuring insurance on the property. The plant and the switchboard were burned; they per-

haps cost as much as $6,000.00 at the beginning, but under the proof they were worth no more than $3,500.00, the amount of the insurance carried. At any rate there is nothing to show that these complaints are of such a nature as requires the interference of the court under the rule, *supra*.

Other questions are presented and discussed, but under the view which we have reached it will be unnecessary for us to consider them, since we have concluded that the judgment was proper with the modification we have herein made to the effect that it will not be a bar to the creditors' rights if they have occasion to resort to them in the future.

Wherefore, the judgment is affirmed, the whole court sitting.