## LAMPRECHT v. SWISS OIL CORPORATION et al.

Circuit Court of Appeals, Sixth Circuit.
May 10, 1929.

Nos. 5219, 5220.

Howard B. Lee, of Louisville, Ky. (Arthur Peter and Peter, Lee, Tabb, Krieger & Heyburn, all of Louisville, Ky., on the brief), for appellants Bingham and others.

W. T. Kinder, of Cleveland, Ohio (James Park, of Lexington, Ky., and Tolles, Hogsett & Ginn and J. W. Reavis, all of Cleveland, Ohio, on the brief), for appellant Lamprecht, II.

Henry Russell Platt, of Chicago, Ill. (Mayer, Meyer, Austrian & Platt, of Chicago, Ill., and William W. Corlett, of New York City, on the brief), for appellee Swiss Oil Corporation.

Hunt, Northcutt & Bush, of Lexington, Ky., and Dent, Dobyns & Freeman, of Chicago, Ill., for other appellees.

Wm. Marshall Bullitt, of Louisville, Ky., for certain stockholders.

Before HICKS, HICKENLOOPER, and KNAPPEN, Circuit Judges.

KNAPPEN, Circuit Judge. For present purposes, the situation out of which this case grows may be thus sufficiently stated:

The Swiss Oil Corporation (hereinafter called the Swiss Company) is a Kentucky corporation, having its principal office at Lexington, in that state, and engaged in producing oil. It had a large number of oil properties variously located. Defendant Combs was president of the Swiss Company, J. Fred Miles its vice president and general manager, and defendant McDonald its secre-

tary-treasurer and general counsel. Defendant Pynchon & Co. was a partnership engaged in merchandising financial securities, with offices in Chicago and New York. Defendant Martin, who resided in Chicago, was a partner in Pynchon & Co. and a director of the Swiss Company. The latter was capitalized at $5,000,000, only $2,806,000 of stock having been issued. In, and for a long time before, 1924, the business of the Swiss Company was unprofitable. It had been steadily losing money. It desired to procure profitable oil-producing properties.

On July 29, 1924, President Combs and one Thraves, in their own names, but in the interest of the Swiss Company, took from the three stockholders of the Union Gas & Oil Company (which was a wealthy and successful owner and operator of gas and oil properties in Kentucky and elsewhere) an option for the purchase of the entire capital stock of that company, $5,000,000, at par, $1,500,000 thereof payable in cash practically on the acceptance of the option; an additional $1,000,-000 as soon as earned through the continued operation of its properties by the Union Gas & Oil Company; whereupon the stock certificates were to be delivered to the optionees, and the remaining $2,500,000 of the purchase price secured by a series of mortgage notes constituting a first lien upon the Union Gas & Oil Company properties. Soon after the option was taken Thraves formally assigned his interest thereunder to Combs, in whose name the extensions were all taken. The option as originally given ran until November 1, 1924. Written extensions were made to December 8, 1924, and again until January 7, 1925, and thereafter, orally, at least until January 12, 1925—Combs being reimbursed by the Swiss Company on account of an aggregate of $75,000 paid upon the written extensions of the option. On January 7, 1925, Combs assigned the option to the Swiss Company.

On January 12, 1925, the day it was understood the option would expire, Combs notified the Union Gas & Oil Company's stockholders of his acceptance of the option and his election to purchase the property covered thereby, and binding himself to make the initial payment thereunder of $1,500,000 on or before February 1, 1925.

In order to enable the Swiss Company to take the benefit of the option for the purchase of the Union Gas & Oil Company's stock, it was necessary to have financial assistance and backing. Accordingly, through Martin's efforts, an arrangement was made whereby Pynchon & Co. (in whose name Combs had meanwhile caused the acceptance of the Union Gas & Oil option to be taken) caused the contract for the purchase of the latter company's stock to be conveyed to the Swiss Company, and in that connection received from the latter company $2,000,000 of its theretofore unissued stock, and $2,000,000 par value of its 7 per cent. mortgage gold notes, secured on the Swiss Company's original properties; Pynchon thereupon paying the Swiss Company $1,750,000 in cash, of which amount $1,500,000 was to be applied in payment of the first installment on the purchase of the Union Gas & Oil Company's stock. The remaining $194,000 par value of the Swiss Company's stock theretofore unissued was to be held by Pynchon & Co. for the benefit of the Swiss Company. This action was fully approved by both the directors and stockholders of the Swiss Company. Among other provisions for the protection of Pynchon & Co., they were to have the privilege of selecting three more directors (in lieu of three then present directors), in addition to the three already regarded as representing Pynchon & Co., thus giving them six of the eleven directors.

Lamprecht, who is a stockholder in the Swiss Company, claiming that the issue of $2,000,000 of the capital stock, and $2,000,-000 of mortgage notes of that company, for $1,750,000 cash, amounted merely to the issue of $2,000,000 of Swiss Company notes at 87½ cents on the dollar, with a bonus of 100 per cent. of stock, and so violated the Constitution and statute of Kentucky, which forbid the issuing of corporate stocks or bonds, except for an equivalent in money paid or labor done, and, asserting that the issue of said stocks and bonds was procured by fraud, conspiracy, and misrepresentation on the part of certain directors and stockholders of the Swiss Company, filed in this cause bill in equity against the Swiss Company, Pynchon & Co., Martin, Combs, McDonald, and about 100 other defendants, on behalf of himself and all others similarly situated (the Swiss Company having refused to take the action requested), praying that the stocks and bonds so issued to and held by Pynchon & Co. be canceled, and that so much of the capital stock as was alleged to have been bought from Pynchon & Co. by certain directors of the Swiss Company at substantially the cost price thereof to Pynchon & Co. be likewise canceled.

Three stockholders of the Swiss Company intervened as plaintiffs. Upon hearing on pleadings and proofs, Judge Cochran dismissed the bill. Separate appeals were tak-

648

en by the original complainant and the intervening complainants respectively—the latter being No. 5220. Counsel agree, in effect, that the only issue tried below, and the only issue before this court, is the validity of the initial issuance in January, 1925, to Pynchon & Co. of the $2,000,000 par value of the Swiss Company stock.[1]

Judge Cochran's opinion (omitting a prefatory paragraph, and renumbering the sections) is as follows:

"1. It is urged on behalf of the defendants that, even if the nature of the transaction complained of was as plaintiff and interveners claim it to have been, they are not entitled to the relief they seek. They claim that its nature was this. Pynchon & Co. purchased the defendant corporation's notes for $2,000,000 at a discount of 12½ per cent., i. e., for $1,750,000, and it issued to them $2,000,000 of its stock as a bonus for thus discounting its notes. The relief sought is the cancellation of the stock issued. It will be noted that no effort is made to recover the discount of $250,000. I do not find it necessary to pass on this position of defendants. But I am sure that neither one of the two decisions of the appellate court of this circuit, to wit, *Altenberg v. Grant* (C. C. A.) 85 F. 345, and *Detroit-Kentucky Coal Co. v. Bickett Coal & Coke Co.* (C. C. A.) 251 F. 542; or of the five decisions of the Kentucky Court of Appeals, to wit, *Mayfield Water & Light Co. v. Graves County Banking & Trust Co.*, 170 Ky. 56, 185 S. W. 485, *Taylor v. Citizens' Oil Co.*, 182 Ky. 350, 206 S. W. 644, *Stoecker v. Goodman*, 183 Ky. 330, 209 S. W. 374, *Rice v. Thomas*, 184 Ky. 168, 211 S. W. 428, and *McCombs Producing & Refining Co. v. Ogle*, 200 Ky. 208, 254 S. W. 425, is against this position of defendants. This is so because in neither one of those cases were the ultimate facts the same as they are here. What are the ultimate facts of this case apart from the transaction being as plaintiff claims it was? They are these:

"2. At the time of the transaction the defendant corporation faced liquidation. Without the acquisition of the stock or property of the Union Oil & Gas Company it could not continue in business. This was so because taking into consideration depletion and depreciation, which should be taken into consideration, it was not meeting operating expenses. Every day which it continued to operate under existing conditions it was get-

ting farther and farther behind. This is not disputed. Counsel for plaintiffs and interveners have not a word to say to the contrary of this in their briefs.

"3. The stock or properties of the Union Gas & Oil Company were reasonably worth, at least to the defendant corporation, more than $2,250,000, i. e., the sum of the discount and of the par value of the bonus stock, in excess of the purchase price of the stock of that company, to wit, $5,000,000. Counsel for plaintiffs and intervenors make much of the phrase 'market price' in the constitutional and statutory provisions prohibiting the receipt by a corporation of property in payment for its stock at a greater value than the market price thereof. Neither the entire stock of the Union Oil & Gas Company nor its properties had any market value much less price in the primary significance of that phrase at that time. It had not theretofore been placed upon the market. Its stock was owned by three persons and not a share of it had ever been put on the market or sold. The fact that they were willing to sell for $5,000,000 is not against such being the case as to its reasonable worth. The owners of the stock were constrained to sell and at that figure by dissensions amongst themselves and the litigation to which they had and were being subjected and the possible outcome thereof. Mr. Ayres, the more active of the three owners of the stock, testified that he told all persons with whom he came in contact, prior to the sale, that the properties were worth from $8,000,000 to $10,000,000. Nor is the offer of $4,250,000 made by the Philadelphia Company against it. That may have been all that it had to offer. That such was its reasonable worth is made good by the appraisement of Fretter written by Miles and submitted by him to the directors January 26, 1925, when the transaction was closed, which placed the value at $12,500,000 and the appraisement of Conrad as of February 1, 1925, which was slightly under $8,000,000. It is borne out by the statements frequently made by Miles to Manning before the sale that the properties were worth some $10,000,000 or $12,000,000 and by this statement in Miles' written report to the directors made at their meeting on January 26, 1925, to wit:

" 'Following a long period of negotiations the opportunity is now afforded our company to purchase the stock of the Union Oil & Gas Company, representing said properties, upon terms which your officers regard as entirely practicable and highly advantageous.'

"In view of these statements thus made his opinion expressed on the trial that the

---

[1] While, in one of the briefs the stock, the validity of whose issue is in question, is given at $2,194,000, the inclusion of the $194,000 is seemingly inadvertent.

stock or properties were worth only $5,000,-000 is not entitled to consideration. Furthermore, that these properties were reasonably worth more than $2,250,000 in excess of the purchase price of $5,000,000, at least to the defendant corporation, is upheld by two considerations. One is that the directors were willing to make the transaction. This willingness can reasonably be accounted for on no other ground than that in their judgment such was the case. The other is the outcome of the transaction. The proof of the pudding is to be found in its eating. Prior thereto the stock of the defendant corporation was selling at from 10 to 20 per cent. of par value, whereas after its acquisition in 1926, its stock, according to Miles' testimony, was worth par, which testimony was not contradicted by a single witness. Evidently the defendant corporation is in a flourishing condition notwithstanding the depression in the oil market. There is no reasonable ground for questioning that the Constitution and statute are met if property given in payment for stock is worth to the corporation the par value of the stock. In the case of Clinton Mining & Mineral Co. v. Jamison (C. C. A.) 256 F. 577–582, it was said:

" 'The cost to the vendors is not a test of value. * .* * We are concerned with their value to the corporation and that value may exceed what it cost the vendors.'

"4. It was impossible for the defendant corporation to acquire the stock or properties of the Union Oil & Gas Company except on Pynchon & Co.'s terms. For five months it had made strenuous efforts to finance the proposition and had failed. There was nothing that could reasonably have been done to this end that was not done. The defendant corporation was at the end of its rope. The Manning proposition was unacceptable to everybody. There was no reasonable prospect of making an arrangement with Otis & Co. What they suggested called for bonus stock. It was a case of life or death. Either the defendant corporation had to lose the over $91,000 which it had expended in connection with the option and go into liquidation, or by coming to Pynchon's terms being put on its feet and rendered prosperous. Such, then, are the ultimate facts of this case apart from the transaction itself and in the light of which it must be viewed.

"What we have then is this. It is true that the defendant corporation got nothing from Pynchon & Co. for its stock. It was pure bonus to them. But by so doing, with the cash which it thus obtained from Pynchon & Co., it was enabled to procure from the Union Oil & Gas Company property which was reasonably worth to the defendant corporation over and above the purchase price more than the discount and par value of the stock. Thereby Pynchon & Co. enabled them to get this which they could not otherwise get. It is not necessary to go through the seven decisions relied on by plaintiff to show that not one of them presented such a case as we have here. In the case of Altenberg v. Grant, supra, Judge Taft said:

" 'The great abuses which have been perpetrated, and the deceits which have been practiced upon the public, in the organization of corporations by the issue of stock and bonds, the par value of which has been grossly in excess of the real capital embarked in their business, are too well known to require comment.'

"He then continues as follows:

" 'The framers of this section and the people who adopted it proposed to remedy these abuses by a specific requirement that no one should acquire stock or bonds from the corporation without having contributed to the capital, available for carrying on its business, cash or its full equivalent in labor or property equal to the par of the stock or bonds received.'

"Counsel for plaintiff emphasize this last statement by putting it in italics and quoting it twice. Now it may be true that Pynchon & Co. did not themselves directly contribute to the capital of the defendant corporation, available for carrying on its business property of the par value of the bonus stock, but thereby, i. e., by what they did, i. e., supplying it with $1,750,000 in cash, there was contributed thereto property of greater value than that stock. It came from the Union Oil & Gas Company, but only through what Pynchon & Co. did. And the defendant corporation could not otherwise have acquired it. Though Pynchon & Co. did not make this contribution to the capital of the defendant corporation, which not only made it available for carrying on its business, but saved its life, directly, it did so indirectly. They were as really the cause of the contribution as if they had made it directly. It is open to say, therefore, that though the issuance of the stock was within the letter of the prohibition of the constitution and statute it was not within its spirit. But though such is the case, I am taking no other position under this head than that the decisions relied on by plaintiff and intervenors are not, to use an expression of Judge Cantrill, in one of the opinions which he delivered during the short time he was on the Court of Appeals, 'within a mile

of this case.' They are certainly not authorities for the position that the plaintiff and interveners have the right to have the defendant corporation retain what it thus acquired and at the same time to have Pynchon & Co. deprived of that which they acquired, which was the sole inducement to their doing that which enabled it to acquire it.

"5. The real nature of the transaction was not as plaintiff and interveners claim it to have been, but this. The consideration for the issuance of the notes and stock to Pynchon & Co. was not merely $1,750,000 cash, but the assignment of the contract which they had with the stockholders of the Union Oil & Gas Company to assign their stock to them. The transaction was so shaped. It was in order that the transaction might not be successfully attacked, but might be valid. That such was the purpose which led to its being so shaped did not prevent its real nature being as stated. Nor does this circumstance render the transaction invalid on the basis that such was its real nature. We have seen that the transaction as first proposed was not within the spirit of the prohibition of the Constitution and statute. By so shaping it the transaction was taken out of the letter thereof also.

"In determining what was the real nature of the transaction the minutes of the meetings of the directors on January 10, 1925, and of the directors and stockholders on January 26, 1926, must be accepted as evidencing what took place. The testimony of Miles, Cromwell and Jones, in so far as they are in conflict with what the minutes show took place on January 26, 1925, backed up as they are by the testimony of the others who were present at those meetings, cannot be accepted. The correctness of the minutes of the meeting of January 10, 1925, does not depend solely on the testimony of Combs, Insull, McDonald, Cates, and Evans. They are supported by the statement of the verified bill of complaint as to what took place at that meeting, which information plaintiff testified he obtained from Miles. They are also supported by the testimony of Cromwell that it was a matter of discussion at that meeting that if Combs 'could not dispose of the option to the advantage of the Company that he would just simply have to let it lapse.' The fact that the action taken at that meeting was the authorization of a disposition of the option negatives the position of plaintiff and intervenors that Combs accepted the option on January 12, 1925, on behalf of the defendant corporation and supports the position of defendants that what happened before the acceptance of

the option was that Combs disposed of it to Pynchon & Co. and accepted it on their behalf by their authorization.

"It is not against this that the authorization given to Combs to dispose of the option was general and not specific. It was made general because it was not then known whether Pynchon & Co. would accept the option. Martin had to communicate with his New York partners before he would say that they would accept it. That Combs was authorized to dispose of the option shows that all idea that the option would be accepted on behalf of the defendant corporation had been given up and the only hope left was that the option might be disposed of to Pynchon & Co. and if not to them to some one else. That the real nature of the transaction was that Combs disposed of the option to Pynchon & Co. and accepted it on their behalf, so that thereupon the contract entered into was that of Pynchon & Co. and not of the defendant corporation, is supported not only by the showing made by the minutes of January 10, 1925, but by the testimony of Combs, Insull, McDonald, Cates, and Evans as to what took place at that meeting, not recorded in the minutes, by the testimony of Combs, Martin and McDonald as to what took place between Combs and Martin in regard to handling the option, by the telegram from Martin to Combs and by what took place at the meetings on January 26, 1925. The proposal which was submitted by Pynchon & Co. at that meeting starts out with this statement:

" 'Referring to negotiations between us relative to your purchase from us of a certain contract for the purchase of all the capital of Union Gas & Oil Company.'

"Here is a claim that they were the owners of that contract and had it for sale. Upon the acceptance of the option by Combs, Pynchon & Co. came under contract obligation to the stockholders of the Union Gas & Oil Co. to take their stock on the terms stated in the option and those stockholders could have held them to this contract. Likewise, Combs could have held them to it. It is inconceivable that Combs would have accepted the option otherwise than on behalf of Pynchon & Co. He had the telegram from Martin to hold them to the consequences of his act. The transfer of the contract from Combs to Lindsay, trustee, and then from Lindsay, trustee, to the defendant corporation was not to shield Pynchon & Co. from being under any contract liability to the stockholders of the Union Oil & Gas Company, but because it was the only way in which the matter could be conveniently handled. In order that Pynchon & Co.

could assign the contract to the defendant corporation it was necessary that it be assigned by Combs to them or to a trustee. To assign it to them would bring in the individual partners, who were eleven in number. To get their signatures to an assignment would cause delay. Hence the simple method of having the assignment made to a trustee was resorted to.

"The disposition of the option to Pynchon & Co., however, was not an unqualified one. It was made with the understanding that Pynchon & Co. would assign the contract created by the assignment of the option on their behalf to defendant corporation and pay it $1,750,000 in return for the notes and stock. That such was the understanding accounts for the number of things which plaintiff and intervenors have seized hold of as tending to show that the transaction was as they claim it to have been and not as defendants claim. I do not find it necessary to consider these things in detail. Sufficient to say that I have considered them all, and no one of them militates against the transaction being as I have held it to be.

"6. Such being the nature of the transaction there is no possible room for claiming it to be invalid. Indeed plaintiff's bill is not based on the position that if such was the nature of the transaction it was invalid. It is based solely on the claim that the nature of the transaction was that Pynchon & Co. purchased the defendant's notes for $2,000,000 at a discount of 12½ per cent., i. e., for $1,750,000 and issued to them $2,000,000 of its stock as a bonus for thus discounting its notes.

"7. There was no conspiracy on the part of the directors to wrong the corporation or any stockholder therein or intent on their part to deceive. In all that they did they acted for what they conceived to be the best interests of those for whom they were acting. It was not possible for any one to have done better by their principals than they did. It is true that certain of the directors were personally benefited by the notes and stock which they received from Pynchon & Co. But they were not led to do what they did by a desire to enrich themselves at the expense of those for whom they were acting. It was solely in order to bring about a consummation of the deal with Pynchon & Co. Martin was not authorized to speak for his firm when the matter was first broached. It was uncertain whether they would agree to come to the rescue. It was a life or death matter with defendant corporation as to whether Pynchon & Co. would do so. Their willingness to take a part of the notes and stock would tend to cause them to so agree.

"8. As to the Brown settlement it is clear that what was done was simply to buy peace.

"9. On the questions as to whether plaintiff and intervenors are estopped to question the transaction complained of or are barred by laches I do not find it necessary to pass on.

"This case as I sum it up is this. Before the transaction complained of took place the stock of plaintiff and intervenors was selling at 15 to 20 per cent. of its par value. After the transaction and by reason thereof, according to the only testimony in the record bearing on the question, it has become worth par. They would retain the advantage which has thus accrued to them by virtue of Pynchon & Co.'s action and yet would take further advantage to themselves by taking from Pynchon & Co. and those claiming under them that alone which induced them to take that action. This is not right.

"Let the bill be dismissed at plaintiff's cost."

If we accept the fact conclusion of the district judge, that the Union Gas & Oil Company properties received by the Swiss Company had a fair and reasonable value equal to what was paid therefor directly by the latter company, plus the par value of the bonus stock and the discount on the notes, viz. an aggregate of $7,250,000, we have no difficulty in reaching the legal conclusion that the transaction did not violate the Constitution and statute of Kentucky, and that the bill of complaint was properly dismissed.

Section 193 of the present Constitution (Carroll, 1903, p. 142) declares: "No corporation shall issue stocks or bonds except for an equivalent in money paid or labor done, or property actually received and applied to the purposes for which such corporation was created, and neither labor nor property shall be received in payment of stock or bonds at a greater value than the market price at the time such labor was done or property delivered, and all fictitious increase of stock or indebtedness shall be void."

Section 568 of the Kentucky Statutes merely re-enacts the constitutional provision. While it is the settled construction of these constitutional and statutory provisions, both by this court and the Kentucky courts, that corporate stocks or bonds can be issued in exchange for work or property only when the "market price" thereof is equal to the par value of the bonds or stock so exchanged,[2] we think that under the facts gen-

[2] Altenberg v. Grant (C. C. A.) 85 F. 345, 347; Detroit-Kentucky Co. v. Bickett, etc., Co. (C. C.

erally stated in section 2 of the District Judge's opinion, the term "market price" means "market value" in the secondary sense of that term, viz: the fair and reasonable value which the property would have if dealt with as at a market overt; that such fair and reasonable value may be arrived at by a consideration not only of actual sales, prices at which held and prices offered, but of a multitude of attendant considerations, including the intrinsic value of the property delivered in payment for the stocks and bonds. This proposition is, we think, fully sustained by considered court decisions under analogous situations, as well as by standard text-writers. North American Telegraph Co. v. Northern Pac. R. Co. (C. C. A. 8) 254 F. 417, 418; (certiorari denied, 249 U. S. 607, 39 S. Ct. 290, 63 L. Ed. 799); Walter v. Duffy (C. C. A. 3) 287 F. 41, 45, 48; Chamberlayne on Evidence, §§ 2099h, 2099i; Holmes, Fed. Taxes (1923 Ed.) pp. 510–513, Cf. Clinton, etc., Co. v. Jamison (C. C. A. 3) 256 F. 577; Phillips v. United States (D. C.) 12 F.(2d) 598, 601.[3]

Whether or not, as applied to the facts of this case, the value to the Swiss Company is the ultimate test of the value of the properties given that company in payment for its stock and bonds (Clinton, etc., Co. v. Jamison, supra, 256 F. at page 582), as would seem to accord with the spirit of and apparent reason for the constitutional provision, such value is surely a prominent element in determining the fair and reasonable value of the securities.

We have no difficulty in accepting the fact conclusion of the District Judge that the Union Gas & Oil Company properties had a fair and reasonable value fully equal to the $5,000,000 paid therefor, plus the par value of the Swiss Company's stocks and the discount on bonds given therefor. The case was heard in open court, the testimony of about one-half in number of the witnesses being

A.) 251 F. 542, 546; Mayfield, etc., Co. v. Graves County Banking & Trust Co., 170 Ky. 56, 59, 185 S. W. 485; Taylor v. Citizens Oil Co., 182 Ky. 350, 359, 206 S. W. 644, et seq.; Stoecker v. Goodman, 183 Ky. 330, 337, 209 S. W. 374; Rice v. Thomas, 184 Ky. 168, 173, 211 S. W. 428; McCombs, etc., Co. v. Ogle, 200 Ky. 208, 254 S. W. 425.

[3] In Mayfield, etc., Co. v. Graves County, etc., Co., supra, 170 Ky. at page 60, 185 S. W. 485, the terms "value" and "real value" are both used as if synonymous with "market price"; and in Taylor v. Citizens Oil Co., supra, 182 Ky. at pages 361–366, 206 S. W. 644, the terms "market value," "market value or reasonable value," and "equivalent in value" are apparently used indiscriminately as if synonymous.

there presented orally, including that of the vice president of the Swiss Company, its secretary-treasurer and general counsel, three or more of its directors, and the principal stockholder of the Union Gas & Oil Company. Entirely apart from the weight thereby due the fact conclusions of the District Judge, we think his findings sustained by the preponderance of the testimony.

Upon the subject of value: It was stipulated that Conrad, whose appraisement is referred to by the District Judge, was a petroleum engineer of experience and recognized ability, and, if called as a witness, would testify that the firm with which he was associated specialized in matters of accounting and income tax valuation pertaining to gas properties throughout the principal producing fields of the United States, having had a large experience in the valuation of such properties for the purposes of estimating depletion for income taxes as well as for other purposes. Fretter, whose appraisal is also referred to by the District Judge, was president of the National Refining Company. His appraisal appears to have been based in part upon figures given by the vice president and general manager, Miles, whose official position and general management were taken away at the directors' meeting in January, 1925, and who was a witness for complainant.

In our opinion the conclusion that the Union Gas & Oil Company properties were reasonably worth at least $7,250,000 is convincingly corroborated by the actual result of their purchase, viz. conversion of the Swiss Company from a losing to a profitable operation, thereby bringing the actual value of the Swiss stock (its properties being combined with those of the Union Gas & Oil Company) from much less than 50 per cent. of par up to par. It appears from the balance sheet prepared by an employee of Ernst & Ernst that at the close of business on December 31, 1924, less than a month before the transactions here in question, the aggregate of the Swiss Company's current assets, by way of cash on deposit and on hand, accounts receivable and inventory of oil, gasoline and naphtha, was less than one-third of the aggregate of its notes payable, accounts payable and accrued interest, and its total gross assets but a little more than $2,000,000; also that a net deficit of more than $1,000,000 had resulted from operations had and dividends paid, apparently since June 21, 1918; its capital stock being carried only at the $2,806,000 then outstanding.

From a balance sheet prepared by Ernst & Ernst as of December 31, 1925, after a

little less than one year's operation following the purchase of the Union Gas & Oil Company properties, the quick assets of the consolidated properties are shown to be more than three times the current liabilities, and that there existed a surplus, including appreciation of properties (but excluding the Ashland Refining Company, a subsidiary of the Swiss Company) of more than $640,000.

It clearly appears to have been, if not the universal, at least the general opinion of the officers and directors of the Swiss Company that it had no recourse but liquidation unless it acquired the Union Gas & Oil Company properties. We also think it appears by a preponderance of the evidence that the Pynchon proposition was the only available plan presented (after long and systematic negotiations), which, in the opinion of the Swiss Company's officers and directors generally, promised substantial hope of success. We find nothing in the decisions of the Kentucky courts or of this court opposed to the lawfulness of the transaction in question under what we think were the existing circumstances.

█ We are not impressed that the course taken, of assigning the Union Gas & Oil Company option to Pynchon & Co., and the latter's reassignment to the Swiss Company, was necessary to the validity of the sale of the securities of the latter company; but we think that the fact that such course was taken does not disturb the effect of the transaction otherwise. Granting that the course taken may have been designed to present an appearance of a good-faith purchase by a third party, yet if, as we think was the case, the sale of the Swiss securities, independently of that action, did not violate the Kentucky law, no harm was done. The Swiss Company could not have borrowed $2,000,000 in the usual way. Its own property was already mortgaged. It appears that its first mortgage bonds, issued several years before, had been underwritten at 90 per cent. of their face. The Union Gas & Oil Company properties were to be held as security for the $2,500,000 to the stockholders of that company, and could practically not be used as security for anything more. However, through the conveyance, at Martin's instance, to and from Pynchon & Co., the Swiss Company obtained something of substantial value besides $1,750,000 in money. Not only did Pynchon & Co. become trustee for the holding of the previously unissued Swiss stock of a par value of $194,000, but through the fact of its acceptance of the purchase option and its controlling representation on the directorate

of the Swiss Company became practically interested in the Swiss Company's carrying out of the purchase, and in a very proper sense indirectly—though no less effectively—secured to the Swiss Company the Union Gas & Oil Company properties.

█ While there is some testimony which complainant contends indicates a conspiracy on the part of some of the officers and directors of the Swiss Company to defraud that company and its stockholders, and that the actual situation was not disclosed at the meetings of directors and stockholders, which authorized or ratified the Pynchon transaction, we are impressed that the evidence decidedly preponderates to the contrary. True, several of the directors of that Company bought from Pynchon & Co. substantial amounts of the bonds at but little above their cost to Pynchon & Co. But, as we understand the record, such sales were intended not as a means of securing the contract from the Swiss Company, but of insurance to that extent of Pynchon's ability to sell the securities at some profit. Indeed, in the letter from Combs to Brown, introduced by complainant, the Pynchon plan is referred to as "authorizing us to offer to any and all of our stockholders, upon exactly the basis of the purchase price, as much or as little of the notes and stock as they might elect to acquire." The record of Pynchon & Co.'s sales, as we understand it, indicates that the bulk of all the sales were made at 90 per cent. of the par value of the notes, carrying 100 per cent. of bonus stock; that in a few instances sales were made at as high as 92½ per cent. of par value of notes when conveying about 25 per cent. of stock; and that but three persons were given a lower rate than 90 per cent. (viz. 87½%) of par value of notes, with 100 per cent. of bonus stock. These persons were Director Martin (a member of Pynchon & Co.), Lindsey (trustee under the Pynchon & Co. contract, and an employee of that company), and Director Insull—the latter having paid about two weeks later 90 per cent. of the face of the notes with 100 per cent. of stock.[4]

---

[4] We see no significance in the fact that the Swiss Company, at the time of the trial, had repurchased $729,500 of its notes, paying for the majority thereof par and interest and without receiving any of the bonus stock. The bulk of these purchases were made within a year (some within about four months) before the maturity of the notes, which were then of unquestionable value. The Swiss Company was bound to pay them soon, was amply able to do so, and by taking them up before due saved a substantial amount of interest. Naturally, the bonus stock, which was by that time worth par, would not

We are not impressed that the so-called settlement between Combs and Eli H. Brown, referred to in the opinion of the District Judge, considered in connection with the testimony of the two parties thereto, evidences any fraud or wrongdoing in connection with the Pynchon transactions.

Nor do we see any reason to believe that stockholders not purchasing securities from Pynchon & Co. have suffered injury from the transaction in question. While the same opportunity seems to have been given stockholders generally to buy on a basis as low as 90 per cent. of par of bonds, plus 100 per cent. of stock, comparatively few seem to have bought. On the other hand, the old Swiss stockholders seem to have at least had their holdings doubled in value as the result of the purchase of the Union Gas & Oil Company properties.

The conclusions we have announced make it unnecessary to consider the questions of estoppel and laches, as applied to complainant and the interveners.

We think the bill was rightly dismissed on the merits, and that the decree of the District Court should be affirmed.

be surrendered. In view of this situation, we see no pertinency in the suggestion that these purchases did not start until after the complainant had demanded that an action be instituted to attack the legality of the transactions.