## Stoecker, Schreick, Kaelin, Schuler, Doerhoefer and Stoke v. Goodman, et al.

### Kaiser v. Goodman, et al.

### Jochim v. Goodman, et al.

### Miller v. Goodman, et al.

### Sebolt v. Goodman, et al.

### Lang v. Goodman, et al.

### Ruby v. Goodman, et al.

### Ehell v. Goodman, et al.

(Decided February 21, 1919.)

### Appeals from Jefferson Circuit Court (Chancery Branch, Second Division).

1.  Corporations—Subscriptions to Stock—Liability for Unpaid Subscriptions—Bona Fide Purchasers.—A corporation issued a cer-

tificate of common stock to an agent with the agreement that the common stock should be given as a bonus to purchasers of preferred stock, who were informed that they would receive one share of common stock with each two shares of preferred. No stock was assigned to the purchasers by the agent, but the stock was issued and accepted by them directly from the company. Held, that such purchasers were not bona fide transferees for value, but were liable to the creditors of the corporation for the par value of the common stock.

2. Corporations—Subscriptions to Stock—Bonus Common Stock With Subscription to Preferred Stock.—Where persons subscribed for preferred stock at a par value of $25.00 per share, at the price of $35.00 per share, with the understanding that they would receive one share of common stock with each two shares of preferred, the additional $10.00 was paid solely as a premium on ecah share of preferred, and was in no sense a payment on the common stock, and the purchasers were not entitled to have their indebtedness for the common stock credited by the premium paid on the preferred stock.

3. Corporations—Subscriptions to Stock—Liability of Stockholders to Creditors.—Under Constitution, section 193, and Kentucky Statutes, section 547, the liability of stockholders to creditors of a corporation for unpaid stock subscriptions is absolute, and is not affected by the creditors' knowledge, or want of knowledge, when the credit was extended, that the stock was issued with the understanding that it was not to be paid for.

4. Bankruptcy—Corporations—Unpaid Stock Subscriptions—Right of Action—Trustee's Sale.—A corporation permitted its agents to sell its preferred stock with the understanding that the purchasers would receive one share of common stock as a bonus with each two shares of preferred, and that the common stock was fully paid and non-assessable. The corporation became bankrupt and the trustee sold its real estate "together with all the personal property, open accounts, notes and all assets belonging to the said Globe Casket Company, and now in the hands of the party of the first part, as aforesaid trustee." Held, unnecessary to determine whether the trustee's right of action for unpaid stock subscriptions could have been sold, but sufficient to say that it was not sold and did not pass to the purchaser at the trustee's sale, in view of the fact that the corporation was estopped to recover the unpaid stock subscription, and the liability of the stockholders was in no sense an asset of the corporation, nor was it ever in the hands of the trustee.

J. W. S. CLEMENTS & KEITH L. BULLITT for appellants, except L. Stoke.

BOLDRICK & GOCKE and FRANKLIN CHAPPELL for appellant, L. Stoke.

BURNETT, BATSON & CARY for appellees, except D. C. Smith.

STRAUS, LEE & KREIGER for appellee, D. C. Smith.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY, COMMISSIONER—Affirming as to Charles W. Stoecker, Jacob Schreick, Martin Kaelin, Xavier Schuler, Louis Doerhoefer and Frank W. Kaiser, denying the appeal of, and affirming as to, Lorenz Jochim, C. A. Miller, Max J. Sebolt, Edward M. Lang, J. E. Ruby and George Ehell, and reversing as to Louis Stoke.

These appeals grow out of the same facts, are prosecuted on the same record and will be considered in one opinion.

The suits were brought by appellees, creditors of the Globe Casket Company, to recover of the appellants, except Frank W. Kaiser, the par value of common stock of that company, alleged to have been received as a bonus in connection with the purchase of the company's preferred stock.    Appellants, Stoecker, Schreick, Kaelin, Schuler, Doerhoefer and Stoke were held liable, and individual judgments were rendered against them for amounts exceeding $500.00.    The judgments rendered against Jochim, Miller, Sebolt, Lang, Ruby and Ehell were for less than $500.00, and each of them prays for an appeal.    The appeal by Frank W. Kaiser is from an order of the court, refusing to permit him to file an intervening petition, asserting title to the liability of the appellants.

The facts are as follows: The Globe Casket Company is a Kentucky corporation, and was incorporated on May 11, 1911.    It continued in business until July 21, 1914, when an involuntary petition in bankruptcy was filed against it.    On August 6, 1914, it was adjudged a bankrupt.    Its assets were insufficient to pay preferred claims, and the unsecured creditors received nothing.

Steps looking to the incorporation of the company were begun in April, 1911, by three promoters, R. H. Hundley, J. A. Schuessler and S. Oppenheimer.    The promoters and their attorney entered into a preliminary agreement, providing for the organization of the corporation with a capital stock of $100,000.00, $50,000.00 of which was to be preferred stock and $50,000.00 common stock.    The par value of each kind of stock was $25.00. It was further provided by the agreement that Hundley would undertake to sell the preferred stock and pay all necessary expenses, and in consideration of his services and to reimburse him for his expenses, the company

would issue to him the entire common stock fully paid. It was further provided that Hundley might, if he desired, sell the preferred stock at a premium and retain for himself all the amounts paid in excess of par, and might also give away so much of his common stock as he might deem necessary to assist him in disposing of the preferred stock. Thereafter, the company was incorporated, and the promoters constituted the first board of directors. Thereupon, the contract between Hundley and the incorporators for the sale of the preferred stock was approved and adopted by the board of directors. The minutes of the meeting also show that it was agreed that the preferred stock should be sold at $35.00 per share, and that this price could be changed only by agreement between the board and Hundley; that the president was directed to issue to Hundley a certificate for two thousand shares of the common stock, fully paid up, the same to be delivered as the preferred stock should be sold, and that it was further agreed that Hundley, out of the common stock, should transfer to each purchaser of preferred stock one share of common for each two shares of preferred sold. Pursuant to this agreement, a certificate for two thousand shares of common stock was issued to Hundley, but the certificate was never detached from the stock book and remained in the possession of the company. As the preferred stock was sold, the common stock, to which each purchaser was entitled, was issued by the company, and a notation made on Hundley's certificate, showing the name of the purchaser and the number of shares of common stock issued to him. The sales of stock were made principally by Hundley, Oppenheimer and C. L. Otto. The subscriptions were taken on blanks, reading as follows:

"Capital $100,000

No. ............ Globe Casket Company

Incorporated

Preston and Burnett Avenue

.................................................................191........

"I hereby subscribe for ................ shares of eight per cent preferred stock of the Globe Casket Company, of Louisville, Kentucky; for which I agree to pay thirty-five ($35.00) dollars per share, fully paid and non-assessable.

"Solicitor ........................................Signature ..........................
"Make all settlements payable to Globe Casket Co. Address ...............................................''

"Capital $100,000
Par Value $25 per share
No......... Globe Casket Company. Amount $............
Incorporated
Preston and Burnett Avenue
.............................................191.......

Received of ...........................................................................
.................................................................................. Dollars
In full payment of ............... shares 8 per cent preferred capital stock of Globe Casket Co. (You are also to receive one share of common stock with each two shares of preferred.) Make all settlements payable to Globe Casket Company.
.............................................................Solicitor.''

In describing the method employed in making sales, Hundley testified as follows: "6. What did you state to purchasers when you were selling the stock, if anything? A. If I would go to see a man to sell him some stock, I would tell him I was, of course, representing the Globe Casket Company, which I was, and the par value of the stock was $25.00 per share, but we sold it at $35.00 a share, but in addition to the preferred stock we would give him one share of common stock with each two shares of preferred. In some cases where some of the prospective buyers would bring up about the common, about whether it was fully paid, I would say, 'It is fully paid and non-assessable, according to my contract.' 10. Why did you say it was paid up and non-assessable, the common stock? A. Because the contract provided that way. 11. How did you pay for it, in what way? A. I was to get that for the services, the common stock, and the money made out of it, I wanted to make some money, of course, in selling this stock I made $20.00 on every two shares of preferred I sold, $10.00 a share commissions, you see. 12. But in order to induce them to do that, as I understand, you told them you would give them one share of common stock for each two shares of preferred? A. That is right, yes. Q. Was there any application or subscription by any purchaser of any other sort of stock except preferred stock? A. No. Q. Did any

purchaser of stock in that company, any of these defendants, buy anything from the company except preferred stock? A. That is all they bought. Q. Did you tell anybody how you came into possession of the $50,000.00 of common stock? A. No, it was none of their business how I got it. Q. How did you explain the increase in the sale price over the par value of that preferred stock? A. . . . I would say to him this common stock is fully paid and non-assessable; there is nobody got any authority to give this stock away but myself; I have a contract with the company. Of course, if that never came out I never mentioned it only when a man would bring the question up himself, and the stock was mine; it was all mine, and the contract was made even before the company was incorporated. The agreement was made, and then after the company was incorporated if I ain't badly mistaken it was signed by the Globe Casket Co. adopting the contract made before the company was incorporated. There is not a man on earth that has got a share of that common stock is liable for it in my opinion.''

Oppenheimer's testimony is as follows: ''57. What was the method as to the issuance of common stock, where preferred had been sold? A. At the time the company was organized, at the direction of the president of the company, the whole common stock, consisting of $50,000.00, was issued to R. H. Hundley, in accordance with the contract entered into between him and the company and in addition passed by the board of directors. Thereafter, whenever preferred stock was sold, I made a memorandum on the back of this certificate of stock which stood in the name of R. H. Hundley, showing the number of the certificate for common stock and the number of shares which were issued as a bonus to the purchaser of the preferred stock. 58. Was this $50,000.00 worth of common stock transferred to Hundley at the organization of your company as compensation to him for selling the preferred stock? A. Only to the extent of $25,000.00. The other $25,000.00 was done for the purpose of evading the law, and to make it plain, at that time none of us had the least conception that there ever could be a possibility that the company should become bankrupt, because we all thought that there was plenty of room for a new company, and we did not dream that there would be any trouble about the common stock. 59. When you took

over Hundley's contract and the balance of the common stock in Hundley's name was transferred to you, state whether or not all of that common stock was to be compensation to you for selling the preferred stock? A. Only to the extent of one-half. 60. What was the other half, that was in your name and Hundley's name at the time he held the contract, to be used for? A. As a bonus, in accordance with the resolution entered on the minutes of the company and Hundley's contract. I wish to say, further, that the resolution as entered on the minutes of the board of directors of the Globe Casket Company goes further than this contract, because on the minutes of the company it is stated expressly that Hundley must give with every two shares of preferred stock one share of common as a bonus, or it says that with every one share of preferred stock he must give one-half of a share of common stock as a bonus; and, if my recollection is right, the contract does not go so far, but states only that this $50,000.00 of common stock shall be used for promotion purposes. . . . I then stated the plan of organization; that the capital stock was $100,000.00, divided into $50,000.00 preferred and $50,000.00 common stock, the par value of each being $25.00 per share; that the preferred was sold at a premium of $10.00, to-wit, $35.00 per share, and that the purchaser of the preferred stock would receive, as a bonus, a half share of common stock with each share of preferred. I might have used, in some cases, the expression, 'one share of common with each two shares of preferred,' or where a man bought 20 shares, I told him, he would receive, with 20 shares of preferred, 10 shares of common, as a bonus; but always on that basis I explained the proposition. After I had convinced my prospect that the proposition was all right and he agreed to become a stockholder I wrote the application, and the purchaser of the stock signed his name and address. I wrote his receipt at the same time I wrote his application, and gave him the receipt—a similar one, like that attached to the application.''

Upon the same question Otto testified as follows: "49. Taking these individuals you sold to, tell the court the basis on which they purchased this preferred stock? A. In the manner that it was presented to them? 50. Yes, sir. A. We went to see them and we told them that the company was capitalized for $100,000.00, $50,000.00

of it was preferred and $50,000.00 of it was common; the preferred stock was an eight per cent cumulative dividend, paid annually, and the par value of it was $25.00 a share, but we were selling it at $35.00 a share, and with each share of preferred stock we gave half a share of common.''

Only two of the appellants, Stoecker and Stoke, testified in their own behalf. Stoke says that he paid $35.00 a share for the preferred stock, and for every two shares of preferred stock he received one share of common stock for nothing. Stoecker says that Hundley and Otto came to his office and told him they had a good thing, and that it was the Globe Casket Company; that they had common stock which had voting power, but the preferred stock did not; that the preferred would pay eight per cent, and that for every share of preferred he bought at $35.00 they would give him one-half share of common. They further told him that the common stock was Hundley's, and that it was full paid and non-assessable. Shortly thereafter he bought 34 shares of preferred and 17 shares of common, at $30.00 a share. At that time he made no inquiries of the company if the common stock had been paid for. Hundley gave him a receipt for the stock and subsequently he received the stock, either through mail or through Mr. Otto.

Section 193 of our Constitution and section 568, Kentucky Statutes, provide that no corporation shall issue stock or bonds except for an equivalent in money paid or labor done, or property actually received and applied to the purposes for which such corporation was created, and neither labor nor property shall be received in payment of stock or bonds at a greater value than the market price at the time said labor was done or property delivered; and all fictitious increases of stock shall be void. Section 547, Kentucky Statutes, provides that the stockholders of each corporation shall be liable to creditors for the full amount of the unpaid part of stock subscribed for by them. For appellants, however, it is suggested that they were *bona fide* purchasers and are not, therefore, liable. The facts, however, do not bring the case within the rule announced in Hess v. Trumbo, 84 S. W. 1153. The contract, as ratified by the board of directors, provided that Hundley should transfer to each purchaser of the preferred stock one share of common stock for each two shares of preferred. In other words, the purpose of

transferring the common stock to Hundley was to enable him to give it away to purchasers of the preferred stock. Manifestly, this scheme was a fraud on the creditors of the corporation. Appellants subscribed for the preferred stock with the understanding that they were to receive one share of common stock for each two shares of preferred stock. They did not purchase the common stock in the open market. They paid nothing for it. They did not deal with Hundley and his assistants as mere stockholders, but dealt with them as agents of the company. No certificates of common stock were assigned to them by Hundley. On the contrary, they received and accepted the common stock directly from the company, knowing that they had paid nothing for it, and that it had been issued to them as a mere bonus pursuant to the subscription contract. Under these circumstances, they were not *bona fide* transferees for value. Gillett v. Chicago Title & Trust Company, 230 Ill. 373, 82 N. E. 891. Though it be true that they incurred no liability to the corporation because of its conduct in permitting its agents to represent the common stock as fully paid, yet they incurred a liability to the creditors of the corporation.

But it is insisted that the chancellor erred in not giving appellants credit for the premium which they paid on the preferred stock.

The argument is as follows: The par value of the preferred stock was only $25.00. They paid a premium of $10.00 per share. The premium was in effect a payment on the common stock. That being true, it follows that each subscriber for two shares of preferred actually paid 80% of the par value of each share of common stock received therewith. The difficulty with this contention is that it does not square with the facts. The uncontradicted evidence shows that appellants subscribed for the preferred stock at the price of $35.00 per share, and that the common stock was given to them. It follows that the additional $10.00 was paid solely as a premium on each share of preferred, and was in no sense a payment on the common stock. Under these circumstances, their indebtedness for the common stock, which was given to them as a bonus, cannot be credited by the premium which they paid on the preferred stock.

On the appeal of Louis Stoke the following facts appear: Stoke purchased several shares of preferred stock

and received as a bonus a number of shares of common stock. About a year later, he became a director of the company, and continued to act as such until its dissolution. During this time, he became surety for the company on certain notes aggregating several thousand dollars, which he was compelled to pay. He insisted below that he was entitled to share with the other creditors in the amount recovered from appellants, but was denied this right on the ground that he acted with full knowledge of the circumstances under which the common stock was issued. It is true that in the case of Miller v. Higginbotham's Admr., 29 Ky. Law Rep. 549, 93 S. W. 655, we recognized and applied the rule that, where one extends credit to a corporation with actual knowledge of the fact that its shares of stock are to be regarded as paid up and non-assessable, he cannot exact from the shareholders the amount of their unpaid subscriptions. That case, however, arose prior to our present Constitution and statutes regulating the subject. It is clear from their provisions that the legislature intended to make stockholders absolutely liable to creditors for their unpaid stock subscriptions, without regard to the creditors' knowledge, or want of knowledge, of the fact that the stock was not paid for when the credit was extended. Thus, in Williams v. Chamberlain, 123 Ky. 150, 94 S. W. 29, a case which arose under an Arizona statute similar to ours, we said: "It is not material whether creditors of the corporation know the amount of the stock actually subscribed, or the amount actually paid on stock subscribed by shareholders. They have a right to deal with the corporation in good faith, and to assume that shareholders who have subscribed for stock have either paid, or will pay, the amount of their subscription; and in the absence of any agreement or understanding between the creditors and the corporation, or shareholders, as to the amount of the liability of the latter, the question as to the creditors' knowledge, or lack of knowledge, of the amount the stockholder has paid, or subscribed to pay, is not material." Other courts have applied the same rule to cases arising under statutes similar to ours. Sprague v. National Bank of America, 172 Ill. 149, 64 A. S. R. 17, 50 N. E. 19, 42 L. R. A. 606; Moore v. United States Barrel Co., 238 Ill. 544, 87 N. E. 536, 128 A. S. R. 153; Eastern National Bank v. American Brick & Tile Company, 70 N. J. Eq. 732, 64 Atlantic 917, 10 Ann. Cases,

84, 8 L. R. A. (N. S.) 271. We therefore conclude that the chancellor erred in holding that Stoke, as a creditor, was not entitled to share in the recovery against appellants, because he extended credit to the company with full knowledge of the conditions under which the common stock was isued.

Appellant, Frank W. Kaiser, insists that the chancellor erred in refusing to permit him to file an intervening petition, asserting title to the amounts recovered by appellees. The basis of his claim is that he was a remote purchaser from the purchaser at the trustee's sale of the assets of the Globe Casket Company, and that as such purchaser he succeeded to the right of action vested in the trustee, and was entitled to the amounts recovered from the delinquent stockholders. The argument is that unpaid stock subscriptions are assets that pass to the trustee in bankruptcy, and may be sold by him as any other assets of the estate. Louis Stoke, through whom Kaiser claims by subsequent deeds and bills of sale, was the original purchaser at the trustee's sale. Under the deed and bill of sale executed by the trustee, Stoke acquired title to certain real estate therein described, "together with all the personal property, open accounts, notes and all assets belonging to the said Globe Casket Company, and now in the hands of the party of the first part, as aforesaid trustee." It will thus be seen that the personal property, transferred by the instrument in question, was limited to such as then belonged to the Globe Casket Company, and was then in the hands of the trustee. The common stock was permitted to be issued by the company's agents upon the representation that it was fully paid and non-assessable. Under these circumstances, the company was estopped to recover the unpaid stock subscriptions. That being true, the liability of appellants was in no sense an asset of the Globe Casket Company, nor was it ever in the hands of the trustee. Hence, it is unnecessary to decide whether the trustee's right of action could have been sold, but sufficient to say that it was not sold, and did not pass to the purchaser at the trustee's sale.

It follows that the chancellor did not err in rejecting the intervening petition.

On the appeals of Charles W. Stoecker, Jacob Schreick, Martin Kaelin, Xavier Schuler, Louis Doerhoefer and Frank W. Kaiser, the judgments are affirmed.

The appeals of C. A. Miller, Max J. Sebolt, Edward M. Lang, J. E. Ruby and George Ehell are denied, and the judgments affirmed. On the appeal of Louis Stoke the judgment is reversed, with directions to enter judgment in conformity with this opinion.