# People's State Bank v. Jacksonian Hotel Co. et al.

(Decided May 28, 1935.)

TAYLOR & MILAM for appellant.
W. D. GILLIAM for appellees.

OPINION OF THE COURT BY JUDGE RICHARDSON—Reversing.

This appeal portrays the venture of businessmen in a line of business outside of that for which they were trained and in which they were inexperienced.

Prior to September, 1929, Cary O. Andrews owned a hotel building and equipment located in Scottsville, Allen county, Ky. The Southern Surety Company was the holder of a mortgage on the property executed and delivered by Andrews to it to secure the payment of $33,000.00. Andrews conducted a hotel in the property, and, not succeeding, he decided to dispose of his equity in order to escape greater, increased loss.

Conceiving they could organize a corporation, issue stock, acquire the property, and successfully operate it until the stock of the corporation could be disposed of at a profit, R. W. Comer, I. D. Turner, Henry Counts, L. O. Johnson, W. B. Fowler, Guy Comer, and E. F. Welch agreed among themselves to acquire the hotel

property and have it deeded to a corporation At that time I. D. Turner was engaged in the mercantile business in the city of Scottsville, in the name of a corporation in which he held $5,000 of its stock. He also had life insurance on his own life. He was indebted to the People's State Bank, Scottsville, Ky., $15,000; to the Farmers' National Bank, Scottsville, Ky., $3,000. The debt of the former was secured by the $5,000 stock in the mercantile establishment and life insurance; that of the latter by a mortgage on his residence. To equip himself so as to participate in organizing the corporation and to acquire the hotel property, he applied to the People's State Bank for a loan of $3,000 with which to pay his indebtedness to the Farmers' National Bank, imparting at the time to its officials the information that he and his associates contemplated organizing a corporation, have the title to the hotel property vested in it, and pay for the stock which he expected to take in the corporation, by conveying to Andrews his residence at the price of $10,000. Realizing the doubtfulness of his indebtedness and the insufficiency of the collateral security, and to better secure his indebtedness of $15,000 the People's State Bank agreed to loan him an additional $3,000 with which to pay his indebtedness to the Farmers' National Bank, so as to relieve his residence of the lien, and thus enable him to convey it to Andrews at the price of $10,000, free of the lien, on the condition that he put up, as collateral to secure the $18,000, the stock to be issued to him by the corporation when organized to acquire the title to the hotel property. This arrangement was agreed to by Turner and the officials of the People's State Bank. The $3,000 was paid to the Farmers' National Bank and his residence deeded to Andrews. Turner's deed to Andrews is not in the record; therefore its date is not shown. The articles of incorporation were acknowledged September 20, 1926. The capital stock was $59,400, divided into 594 shares of $100 each. The incorporators and the amount of stock each subscribed are as follows: I. D. Turner, 250 shares; Henry Counts, 74; L. W. Johnson, 32; W. B. Fowler, 32; L. O. Johnson, 64; E. F. Welch, 32; Guy Comer, 39; and R. W. Comer, 71. The corporation was named Jacksonian Hotel Company. Andrews deeded the hotel property to I. D. Turner, trustee, on the 12th day of September, 1929. At a meeting of the incorporators, R. W. Comer, I. D. Turner, Henry Counts, L. O.

Johnson, Guy Comer, W. B. Fowler, and E. F. Welch were elected directors of the corporation. At a meeting, on the 20th day of September, of the board of directors, Guy Comer was elected president, I. D. Turner, vice president, and E. F. Welch, secretary and treasurer, of the corporation. At this meeting of the directors, in consideration of the stock of the corporation, issued and delivered to the stockholders, in proportion to the number of shares respectively subscribed for by them, Turner, as trustee, deeded the property to the Jacksonian Hotel Company. The deed was accepted by the corporation. At the same meeting a resolution was adopted authorizing and directing I. D. Turner, vice president, and E. F. Welch, secretary and treasurer, to borrow $26,500; to execute the note or notes therefor of the corporation "to be absolutely binding" upon it; and to "pledge any property of the corporation, real and personal, to secure said loan." The $6,500 paid by the incorporators for their stock was obtained on the note of Turner, Fowler, Counts, Comer, and Comer, executed and delivered to L. O. Johnson. On January 29, 1931, the board of directors authorized and directed Turner and Fowler to execute a mortgage on the hotel property to L. O. Johnson to secure him in the payment of the $6,500 note. The mortgage was accordingly executed and delivered on the 31st day of January, 1931. $20,000 was borrowed of Hobdy and also secured by a mortgage on the hotel property. The resolution authorizing the borrowing of the $26,500 recites:

> "That it is necessary to borrow $26,500 in order to finish paying off the mortgage the Southern Surety Company holds against the Jacksonian Hotel property."

This was the balance of the Andrew mortgage on the hotel property. The corporation thereafter assumed and exercised ownership of the property and conducted therein a hotel. It successively failed to meet the payment of Hobdy's $20,000 and Johnson's $6,500 note. Hobdy filed this action to recover the $20,000, and Johnson interpleaded to recover the $6,500, and a decree was entered enforcing their mortgages and directing the sale of the corporation's property to satisfy these debts, interest and costs. It was sold for the price of $28,984.14, the amount of their debts, interest due, and costs. After the 250 shares of stock were issued and delivered by the corporation to Turner, he delivered it

as collateral to secure his indebtedness of $18,000 to the People's State Bank. Later, Turner's debts were discharged by bankruptcy proceedings, leaving the bank with his notes, secured by the 250 shares of stock in the Jacksonian Hotel, and $5,000 stock in the mercantile establishment; the life insurance which it held as collateral had lapsed. The mercantile establishment had failed. Its stock became valueless. As pledgee of the 250 shares of stock in the Jacksonian Hotel Company, the People's State Bank filed an intervening petition in Hobdy's action, setting up the foregoing facts, and sought to compel the incorporators, the stockholders, and directors of the Jacksonian Hotel Company to pay for their stock, or as directors to account for the value of the property mortgaged by the corporation, to secure the Hobdy $20,000 and the Johnson $6,500 note. The court dismissed its petition and denied all relief.

It is here insisting that, as pledgee of the Turner stock, it is entitled to maintain this action; that the stockholders and directors were without right to mortgage its assets to secure their individual debts or to pay for the stock issued and delivered by the company to them; that the facts disclose a disposition, fraudulent in law, of the corporation's assets by the stockholders, the directors, and the officers who participated therein, and they are liable therefor to the amount of $20,000.

In Goff v. Henry Goff & Co.'s Assignee, 257 Ky. 519, 78 S. W. (2d) 758, 760, we reviewed our previous construction of section 193 of our Constituton and sections 547 and 568, Kentucky Statutes. We said:

"Section 193 of our Constitution and section 568, Kentucky Statutes, forbid the issuance of stock of a corporation 'except for an equivalent in money paid or labor done, or property actually received * * * at a greater value than the market price at the time such labor was done or property delivered. * * *' Section 547, Kentucky Statutes, declares stockholders 'shall be liable to creditors [of the corporation] for the full amount of the unpaid part of stock subscribed for by them, and no stockholder shall be liable because of being a stockholder, for any sum more than to the amount of the unpaid part of stock held by such stockholder.' For our construction of these sections, see Stoecker et al. v. Goodman et al., 183 Ky. 330, 209 S. W. 374;

Amick v. Elliott, 222 Ky. 573, 2 S. W. [2d] 367; Lewis v. Hatcher-Powers Shoe Co., 233 Ky. 55, 24 S. W. [2d] 925; Rowan County Lbr. Co. v. Kautz, 246 Ky. 732, 56 S. W. [2d] 1. Their evident purpose is to have in the treasury of the corporation a full equivalent for the outstanding stock. Hess v. Trumbo, 84 S. W. 1153, 27 Ky. Law Rep. 320. The right of action exists under section 547 against a stockholder for the unpaid part of his stock subscription applies where, in violation of section 193 of the Constitution, stock is issued for less value than the face of the stock. Taylor v. Citizens' Oil Co., 182 Ky. 350, 206 S. W. 644.''

It is not doubtful that one who obtains stock of a domestic corporation without paying full par value therefor is liable on this account to the corporation; or if he pays a portion of the par value thereof, he is liable for the difference between the price paid and the par value, and at a suit of the corporation may be compelled to pay therefor or surrender for cancellation, if the corporation is a going concern, all stock in excess of the purchase price paid. If there are no creditors of the corporation, and if the corporation fails or refuses to sue to recover the par value of the stock or the difference between the price paid and its par value, a bona fide stockholder (if the corporation is under the domination of those who have not paid therefor) may institute and maintain, in the corporate name for its use and benefit, an action to recover the unpaid par value or for cancellation of the stock in excess of the reasonable market value of the sum paid or property delivered therefor.

In Taylor et al. v. Citizens' Oil Co. et al., 182 Ky. 350, 206 S. W. 644, 649, we said:

''When a holder of stock is sued by creditors to recover the unpaid balance on his stock subscription, he cannot then surrender the stock and avoid liability; nor can such holder, when sued by the corporation, elect, in the absence of the concurrence of the company or stockholders to pay the balance between the amount given and the face of the stock, and retain the same. His bad faith will not be permitted to work an advantage to him; the election of remedies being open to those only who come with clean hands. Where the control of the

wronged corporation is in the hands of persons who have obtained stock directly from it without giving value or who have paid only an insufficient consideration, or whose interests are antagonistic to the company, and therefore will not institute, or allow to be instituted, proceedings in the name of the corporation to redress the wrong and cause a surrender of the stock issued without consideration, a stockholder may institute and maintain such an action for and on behalf of the corporation. P., C., C. & St. L. R. R. Co. v. Dodd, etc., 115 Ky. 176, 72 S. W. 822, 74 S. W. 1096, 24 Ky. Law Rep. 2057, 25 Ky. Law Rep. 255; O'Hara v. Williamstown, etc., 133 Ky. 828, 119 S. W. 234.''

It will be observed that the right of action in such case is accorded a bona fide stockholder. It is argued by the stockholders and directors that:

''Here the corporation had no creditors but its stockholders, except the bank who was pledgee of Turner's stock. Turner did business with the bank, and at the time this transaction first came up, owed it $15,000.00 which was practically unsecured; his total collateral pledged on his indebtedness not exceeding in actual value $3,000.00. At the time Turner became a stockholder in the corporation he was insolvent, and the bank could not have but known it. Before entering into this venture he advised with Bradley and Rogers, both officers of the bank, and it was agreed that the bank would lend him $3,000.00 to pay off a first mortgage held on his home by the Farmers National Bank, so that he could clear the title to his home and put it in on this deal. This raised Turner's indebtedness to the bank to $18,000.00. The bank knew he got 250 shares of stock in the corporation which was pledged to the bank to secure this $18,000.00 indebtedness. More than that, soon after the stock was pledged to the bank by Turner, he conferred with Bradley and told Bradley he had been offered $1.25 for his stock.''

It is most strenuously insisted that these facts are shown by the evidence and establish that Turner, as the original subscrber of the stock, is without right to compel the other stockholders and directors to pay the un-

paid subscription price of their stock, or to restore the $26,500 with interest—the bank as pledgee occupies his position and is likewise without right to sue herein.

Whether the bank is a bona fide possessor (Henderson v. Pickett's Heirs, 4 T. B. Mon. 54, 16 Am. Dec. 130) of the stock of Turner; i. e., whether it was ignorant of all the facts and circumstances relating to its adversaries' claim at the time the making of the contract by it and Turner, by which it became pledge of the stock, must be determined on the proven facts, known to Turner and the People's State Bank at the time their minds met in the making of the contract of pledge and the advancing thereunder the $3,000. For a statement of the applicable and controlling principle in such case, see American National Bank v. Minor & Son, 142 Ky. 792, 135 S. W. 278; Traders' Securities Co. v. Oslin & Son, 227 Ky. 828, 14 S. W. (2d) 149; National Bank of Ky. et al. v. Fleischaker, 245 Ky. 209, 53 S. W. (2d) 354; Worden v. Kennedy, 246 Ky. 716, 56 S. W. (2d) 329.

As to the information of the bank at the making of the contract between it and him and the advancing the $3,000, Turner's testimony, without that of the officers of the bank, is sufficient to demonstrate beyond cavil that its officers had no knowledge of the amount or the number of shares of stock of the corporation that would be thereafter issued and delivered to Turner, or would be in excess of $10,000, or of the intention of the incorporators or the directors to mortgage the corporation's property with which to pay for the stock issued or to be issued to them or Turner. Respecting this question, Turner testified thus:

"Well, Mr. Andrews came to me and said he was going to have to give up the hotel. In fact the hotel was being sold for indebtedness and I found that out and made a proposition to Mr. Andrews to trade him my home over here to his equity which was, I think, $7,500.00, and he agreed to the proposition. At that time I owed the Peoples State Bank the money that we have just discussed and I went to Mr. Bradley who was president of the bank at that time, and Mr. Rogers, who, I think, was vice-president at the time and consulted with them as to whether or not they considered that a good deal for me to make and agreed to give them the stock

I got issued for this property as collateral against my indebtedness to secure them and asked their permission to make this deal. They each consented to it and said they thought it would strengthen my collateral at the bank and be in better condition than it was the way I had it and on their advice and my idea of the deal, I consummated the deal. Mr. Bradley [for his bank] paid the mortgage off [on my home]; it was $3,000.00 to the Farmers National Bank. The Peoples State Bank furnished $3,000.00 to pay the Farmers National Bank the first mortgage lien.''

That ''cleared the title to my residence.'' ''At that time, I did not know how much stock I was getting.'' He further states that, ''after the organization [of the corporation] and the stock was issued,'' then he ''informed Rogers and Bradley'' that he had ''gotten this $25,000.00 par value stock for $10,000.00 worth of property.''

It is very clear from his testimony that the bank agreed to take the stock as collateral and to furnish, and did furnish, Turner the $3,000 without notice that any stock in the hotel corporation in excess of $10,000 was to be issued and delivered him, and without information that the property of the corporation was to be mortgaged by Turner and the other incorporators and the directors to raise money with which to pay for their stock or any of it. Indeed, Turner himself states that at that time he had no such information, and it would be unreasonable to hold that the officials of the bank at that time had information not then within, or greater than, his knowledge.

Turner, pursuant to the contract with the bank, some time after his stock was issued, as he agreed to do, deposited it with the bank as collateral security for the $18,000 loan, and this was all that was in the minds of the parties when the contract was made for the loaning him the $3,000 and its agreeing to accept his stock thereafter to be issued him, as collateral security for the $18,000.

It is true the agreement of the bank to loan the $3,000, and for Turner to deliver and the bank to accept as collateral security, the stock thereafter issued and delivered him, was not a legal pledge. It was, however, an equitable pledge. Thompson on Corporations,

vol. 6, sec. 42, P. 240 (3d Ed.). This author states the rule applicable in such case thus:

"What is known as an equitable pledge of corporate stock may exist where a certificate of the stock remains with the owner and by some executory contract, express or implied, a right or interest in the thing has been created, which equity will recognize and enforce upon the maxim that equity will regard has been that which ought to be done. There must, however, be a contract from which it sufficiently appears that the particular property was designated by the debtor to be subjected to the payment of the debt."

See Cook on Corporations, vol. 2, sec. 465, p. 1187; 49 C. J. sec. 29, p. 907; 21 R. C. L. sec. 10, p. 642; Casey v. Cavaroc, 96 U. S. 467, 24 L. Ed. 779; Blalock, Allison & Co. v. Keys, etc., 13 Ky. Law Rep. 205.

In a paragraph of the syllabi of the Blalock Case it is written:

"There is an equity in one who advances money on the agreement that certain property shall be intrusted to him as a security, and the delivery of the possession of the property completes the contract, provided there are no intervening equities."

In E. H. Johnson, Trustee, etc., of Burke Manor Hotel Co., v. Burke Manor Bldg. Corp. et al. (C. C. A.) 48 F. (2d) 1031, 1034, 83 A. L. R. 1273, it is stated that:

"A pledge or contract for a pledge, ineffectual for want of delivery, may be rendered valid by a subsequent delivery, even as against an intermediate creditor at large of the pledgor. Of course, such subsequent delivery would not prevail against a creditor who had, between the time of the making of the contract and taking possession under it, acquired a specific lien upon the thing pledged by attachment or levy of execution. The only other obstacle which could prevent such a transaction from being effectual would be the intervention of fraud. Jones on Pledges, sec. 33."

Jones on Collateral Securities, sec. 28, p. 36, thus states the rule:

"As between the parties themselves an actual delivery may not be necessary. The possession may

be regarded, constructively, where the contract places it. Upon this point Mr. Justice Loomis said: 'We have observed, however, for several years a growing laxity on the part of judges and jurists in the application of the principles of constructive pledge delivery, until now it must be confessed there are authorities of great weight and respectability that hold that, as between the parties themselves, an actual delivery may not be necessary, and that the possession may be regarded constructively where the contract places it.' ''

Huntington v. Sherman, 60 Conn. 463, 22 A. 769; Keiser v. Topping, 72 Ill. 226; Martin v. Reie, 11 C. B. (N. S.) 730; Easton v. German-American Bank, 127 U. S. 532, 8 S. Ct. 1297, 32 L. Ed. 210.

At section 30, p. 39, the same author states:

"Obviously a pledge of future property is not effectual until the property comes into existence, and is delivered to the pledgee. As to such property there can only be an agreement to pledge it, because there can be no delivery to make the pledge effectual. * * * technically speaking, of a chattel not in existence, there may be a contract in the nature of an agreement to pledge, which will attach to the chattel as soon as it is produced."

At section 33 it is written:

"That the goods are unfinished when given in pledge, and are to be finished afterward at the expense of the pledgor, is no obstacle to confirming and maintaining the pledge."

The transaction between Turner and the bank at the time of the making of their contract and the bank advancing the $3,000, in the light of these authorties, constituted, as between them, a valid equitable pledge of the stock in the Jacksonian Hotel Company later to be issued to him, and his subsequent delivery thereof, in accordance with the antecedent contract, consummated the pledge. That the pledge was oral is not objectionable (Sanders v. Davis, 13 B. Mon. 432; Mason & Moody v. Scruggs, 207 Ky. 66, 268 S. W. 833); nor does this fact invalidate it.

As to the $3,000 loaned Turner to discharge the lien on his home to enable him to convey it to Andrews free of encumbrance, the bank, according to the excerpt

from Turner's testimony, is unquestionably a bona fide pledgee, for value, without notice. Whether it was, or is, such, as to the $15,000, Turner's pre-existing debt to it, and should be treated and protected as such, remains to be determined.

In determining whether it is a bona fide pledgee as to its pre-existing debt, the Negotiable Instrument Law is in no wise involved. Under an antecedent statute, it was held by this court in a long line of decisions that a creditor who had received negotiable paper from his debtor merely as collateral security for an antecedent debt and parted with nothing of value was not a bona fide holder and did not acquire title superior to that of the legal owner. See Alexander v. Springfield Bank, 2 Metc. 534; Thompson v. Poston, 1 Duv. 389; David v. Merchants' National Bank of Cincinnati, 103 Ky. 586, 45 S. W. 878, 20 Ky. Law Rep. 263; Walker v. Harris' Ex'rs (Ky.) 114 S. W. 775.

This principle has been applied only in cases in which the rights of innocent third persons were involved. The stockholders and directors here sued are not of that class and are not, therefore, entitled to invoke this principle as a shield or a sword.

The same individuals were the incorporators, stockholders, and directors, and their liabilities in these capacities on the developed facts are so interlaced it is impossible as well as unnecessary to separate or distinguish them. In the circumstances, without regarding their liability as stockholders, considering only their relations of officers and directors, their acts as such are to be more closely scrutinized than those of mere stockholders, as they are charged with the management and conduct of the corporation's business. "Directors are bound to exercise nothing short of the uberrima fides of the civil law. They must not in any degree allow their official conduct to be swayed by their private interest or welfare, unless that interest be one they have in the good of the company in common with all the stockholders. They must not profit at the expense of the others. This duty results from the nature of their employment or position, and without any stipulation to that effect. Their private interest must yield to the official duty whenever those interests are conflicting. One cannot faithfully or fairly serve two masters or interests with diverse or conflicting claims. The trust

imposed upon a director as such must not be exercised for his own private exclusive benefit, nor for the benefit of third persons.'' See Reinhart v. Owensboro Planing Mill Co., 185 Ky. 600, 215 S. W. 523, 524; Enterprise F. & M. Works v. Miners' Elkhorn Coal Co., 241 Ky. 779, 45 S. W. (2d) 470.

"When the directors deal with themselves in such a transaction, they are acting in a dual capacity, i. e., representing themselves individually and as trustees, as it were, of the corporation. The presumption is unfavorable to them, and upon their acts being called in question by the corporation, or its creditors, the burden is imposed upon them to show by a preponderance of proof that they acted bona fide and that the corporation got the benefit of their act. Star Mills v. Bailey, supra [140 Ky. 194, 197, 130 S. W. 1077, 140 Am. St. Rep. 370]; Reinhart v. Owensboro Planing Mill Co., 185 Ky. 600, 215 S. W. 523, 524; Ecker v. Ky. Refining Co., 144 Ky. 264, 138 S. W. 264; Chilton v. Bell County Coke & Imp. Co., 153 Ky. 775, 156 S. W. 889, 891; F. T. Gunther Gro. Co. v. Hazel, 179 Ky. 775, 201 S. W. 336; Arnett v. Stephens, supra [199 Ky. 730, 251 S. W. 947]; Covington & L. R. Co. v. Bowler's Heirs, 9 Bush, 468; Walker v. Carter, 208 Ky. 197, 270 S. W. 770; Kenyon Realty Co. v. National Deposit Bank, 140 Ky. 133, 130 S. W. 965, 31 L. R. A. [N. S.] 169." Enterprise F. & M. Works v. Miners' Elkhorn Coal Co., 241 Ky. 779, 45 S. W. (2d) 470, 474.

The mortgaging of the property to pay for the stock of the incorporators was in law a fraud upon the corporation, its creditors, and those stockholders and their pledgees of the corporation's stock who had no knowledge thereof, and who did not directly or indirectly, participate in such misappropriation of the corporation's assets, or so avail themselves of the benefit of the property of the corporation. "When the directors themselves, who must necessarily act for the corporation, mortgage or sell the proprety of the corporation to themselves or one of their members, a different rule obtains from that where the property is sold to a third person in good faith and for a valuable consideration." Enterprise F. & M. Works v. Miners' Coal Co., 241 Ky. 779, 45 S. W. (2d) 470, 474.

On the proven facts, the rights of the directors to resist the bank as pledgee of the Turner stock to secure

its pre-existing debt of $15,000 falls within a different rule to that which governs innocent third parties. The principle stated in Wood & Oliver v. Yeatman, 15 B. Mon 270, controls.

It was our conclusion in that case that Davis was guilty of gross fraud upon Wood and Oliver, but the consequences of his conduct should not be visited upon Yeatman, who, so far as shown by the record, was altogether ignorant of Davis' motive or design in making the purchase of the goods involved and that Yeatman's rights were not impaired by the fraud of Davis of which he had no notice; that he had the right to suppose the goods belonged to Davis, and, upon the faith of a virtual pledge of the goods, acted in good faith and in reliance thereon. See Arnett v. Cloudas, 4 Dana, 299, 300; Parker v. Patrick, 5 Term R. 175.

The acts of Turner and the other incorporators, stockholders and directors, in mortgaging the corporation's assets to raise the $26,500 with which to pay for their stock was an appropriation of the property of the corporation for their individual use, which created on their part a liability therefor, to the People's State Bank, even though it had knowledge in advance that Turner would be issued 250 shares for his residence at $10,000. Their act in so doing was, in law, a fraud on the corporation as well as the bank. Not only should their wrongdoing in this respect not be visited upon the bank, but they should not now be permitted to invoke their own wrongful act in thus misappropriating the property of the corporation, to defeat the right of the bank as pledgee of the Turner stock to secure its pre-existing debt, so far as the $26,500 and interest thereon are concerned.

It is undisputably established by the evidence that, at the time Turner was insolvent and without the agreed price of $10,000 for his residence, the plan and purpose to organize the corporation could, and would, not have been carried out—his residence could not have been used in the deal.

In the circumstances, the bank as pledgee of the stock may sue to avoid such disposition of the corporation's assets, for its situation is similar to that of one who become a shareholder subsequent to a fraud on the corporation. Pollitz v. Gould, 202 N. Y. 11, 94 N. E. 1088, 38 L. R. A. (N. S.) 988, Ann. Cas. 1912D, 1098;

Brown v. Duluth, M. & N. R. Co. (C. C.) 53 F. 889; Andrews Co. v. National Bank of Columbus, 129 Ga. 53, 58 S. E. 633, 121 Am. St. Rep. 186, 12 Ann. Cas. 616.

It is the prevailing rule that a pledgee of corporate stock has a right to invoke the aid of equity to preserve the corporate assets. See Enterprise Trading Co. v. Bank of Crowell (Tex. Civ. App.) 167 S. W. 296; Bank of Des Arc v. Moody, 110 Ark. 39, 161 S. W. 134; Jones Co. v. Home Oil & Dev. Co., 124 La. 148, 49 So. 1009; Kneeland Inv. Co. v. Berendes, 81 Wash. 372, 142 P. 869; Baldwin v. Canfield, 26 Minn. 43, 1 N. W. 261, 276; Andrews Co. v. National Bank, 129 Ga. 53, 58 S. E. 633, 121 Am. St. Rep. 186, 12 Ann. Cas. 616; Pomeroy's Equity Jurisprudence (4th Ed.) vol. 3, p. 2534.

The rule that a corporation cannot mortgage its assets to secure the individual debts of its stockholders, or to obtain money with which to pay for the stock subscribed for by them, is so familiar it scarcely needs authority to sustain its statement. See Fletcher's Cycl. on Corporations, vol. 3, p. 2244, citing Wheeler v. Home Savings & State Bank, 188 Ill. 34, 58 N. E. 598, 80 Am. St. Rep. 161; Minneapolis Threshing Mach. Co. v. Jones, 95 Minn. 127, 103 N. W. 1017; Washington Mill Co. v. Sprague Lbr. Co., 19 Wash. 165, 52 P. 1067. See Andrews Co. v. National Bank of Columbus, 127 Ga. 53, 58 S. E. 633, 121 Am. St. Rep. 186, 12 Ann. Cas. 616.

The evidence establishes that the act of mortgaging the property of the corporation to pay the individual debts of the stockholders was in accordance with the mutual agreement of the incorporators and directors. Aside from this, the ultimate act of executing and delivering the mortgage, and thus misappropriating the $26,500, was that of the directors. Whether they are liable as incorporators or stockholders or directors to the bank as pledgee of the Turner stock it is unnecessary to determine, for plainly they are liable therefor as directors of the corporation. Spellman on Corporate Directors, p. 533; Enterprise F. & M. Works v. Miners' Elkhorn Coal Co., supra.

It is conceded that the purchase price of the hotel property was $43,000, which was paid with the Turner residence at $10,000; the $6,500 cash paid by the stockholders, and the $26,500 borrowed on the notes and mortgages of the corporation.

The authorized capital stock was $59,400, divided into shares of $100.00 each, of which 250 were issued and delivered to Turner and placed by him with the bank as collateral to secure the $18,000, and the remaining 344 shares were issued to the other incorporators and stockholders. Thus it is shown that the bank held as pledgee 250/594, and the other incorporators and stockholders 344/594, of the authorized capital stock. It is apparent that of the $26,500, the balance of the purchase price of the hotel property, was paid out of the proceeds of the notes, secured by the mortgages of the corporation on its property. Of this sum the bank as pledgee is entitled to recover of the directors 250/594 of $26,500, with interest from the date of the notes and mortgages until paid—the amount misappropriated by the directors. It is conceded that the corporation owes no debts, and it is shown that the interest on the notes for the $26,500 was paid by the corporation out of its property and its earnings. The general rule in such case is for the court to enter a decree requiring the directors to restore to the corporation the property misappropriated or its value, for distribution among its creditors, and, if none, to the stockholders. Since there are no creditors or stockholders other than those who brought about the misappropriation involved, the bank as pledgee is entitled to a direct judgment against the directors, as herein indicated.

For the reasons stated, the judgment is reversed for proceedings consistent herewith.